IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

LT. GOV. PHIL BRYANT, in his
private and individual capacity, on behalf
of himself and others similarly situated

and

RYAN S. WALTERS,
MICHAEL E. SHOTWELL and
RICHARD A. CONRAD, ET AL., on behalf
of themselves and others similarly situated                    PETITIONERS

VS.                                                                NO. 2:10-cv-76

ERIC H. HOLDER, JR., in his official
capacity as Attorney General of the United
States; UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
KATHLEEN SEBELIUS, in her official
capacity as the Secretary of the United States
Department of Health and Human Services;
UNITED STATES DEPARTMENT OF
THE TREASURY; TIMOTHY F.
GEITHNER, in his official capacity as the
Secretary of the United States Department
of the Treasury; UNITED STATES
DEPARTMENT OF LABOR; and HILDA
L. SOLIS, in her official capacity as Secretary
of the United States Department of Labor                        DEFENDANTS

_____

FIRST AMENDED PETITION
FOR INJUNCTIVE AND DECLARATORY RELIEF
_____

**COME NOW** the Petitioners, Lt. Gov. Phil Bryant, in his private and individual

capacity, Ryan S. Walters, Michael E. Shotwell, Richard A. Conrad and others named herein,

by and through their attorneys, on behalf of themselves and all others similarly situated, and allege based on personal knowledge all matters pertaining to themselves and upon information and belief as to all other matters, as follows:

## I.

## <u>PARTIES</u>

### A. PETITIONERS

### 1.

Ryan S. Walters is a citizen of the State of Mississippi, residing in Hattiesburg, Mississippi within the jurisdiction of this Court.  Petitioner is a representative of the Petitioner class in this action.

### 2.

Michael E. Shotwell is a citizen of the State of Mississippi, residing in Ellisville, Mississippi within the jurisdiction of this Court.  Petitioner is a representative of the Petitioner class in this action.

### 3.

Richard A. Conrad is a citizen of the State of Mississippi, residing in Laurel, Mississippi within the jurisdiction of this Court.  Petitioner is a representative of the Petitioner class in this action.

### 4.

Diane Perdue is a citizen of the State of Mississippi, residing in Laurel, Mississippi within the jurisdiction of this Court.  Petitioner is a representative of the Petitioner class in

this action.

**5.**

Elizabeth Sullivan is a citizen of the State of Mississippi, residing in Laurel, Mississippi within the jurisdiction of this Court.  Petitioner is a representative of the Petitioner class in this action.

**6.**

William M. Carmichael, Jr. is a citizen of the State of Mississippi, residing in Laurel, Mississippi within the jurisdiction of this Court.  Petitioner is a representative of the Petitioner class in this action.

**7.**

Tonya Nobles is a citizen of the State of Mississippi, residing in Laurel, Mississippi within the jurisdiction of this Court.  Petitioner is a representative of the Petitioner class in this action.

**8.**

Eddie Nobles is a citizen of the State of Mississippi, residing in Laurel, Mississippi within the jurisdiction of this Court.  Petitioner is a representative of the Petitioner class in this action.

**9.**

Mary Kruppe is a citizen of the State of Mississippi, residing in Picayune, Mississippi within the jurisdiction of this Court.  Petitioner is a representative of the Petitioner class in this action.

**10.**

Lisa Stewart is a citizen of the State of Mississippi, residing in Purvis, Mississippi within the jurisdiction of this Court.  Petitioner is a representative of the Petitioner class in this action.

**11.**

Lt. Gov. Phil Bryant is a citizen of the State of Mississippi, residing in Rankin County, Mississippi within the jurisdiction of this Court.  Petitioner is a representative of the Petitioner class or sub-class in this action.

**B.  DEFENDANTS**

**12.**

Eric H. Holder, Jr. is currently the Attorney General of the United States.  In his official capacity, the Attorney General is the chief federal official responsible for the enforcement of all federal statutes in accordance with the Constitution of the United States of America.

**13.**

United States Department of Health & Human Services ("HHS") is an agency of the United States and is responsible for administration and enforcement of the PPACA, through its center for Medicare and Medicaid Services.

**14.**

Kathleen Sebelius is Secretary of HHS and is named as a party in her official capacity.

**15.**

United States Department of the Treasury ("Treasury") is an agency of the United

States and is responsible for administration and enforcement of the PPACA.

## 16.

Timothy F. Geithner is Secretary of the Treasury and is named as a party in his official capacity.

## 17.

United States Department of Labor ("DOL") is an agency of the United States and is responsible for administration and enforcement of the PPACA.

## 18.

Hilda L. Solis is Secretary of DOL and is named as a party in her official capacity.

## II.

## <u>JURISDICTION AND VENUE</u>

## 19.

This action arises under the Constitution of the United States and the laws of the United States.  The jurisdiction of this Court is invoked pursuant to 5 U.S.C. § 8912; 28 U.S.C. § 1331; and  28 U.S.C. § 1346.

## 20.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) and 28 U.S.C. § 1402(a)(1) because Petitioners reside in this district and the events giving rise to these claims arose in this district.

### III.

### <u>NATURE OF ACTION</u>

### 21.

This is an individual action and a statewide class action for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. Rule 57 and for review of agency action pursuant to 5 U.S.C. §§ 701-706. It seeks a determination that certain provisions of the "Patient Protection and Affordable Care Act," H.R. 3590 ("the PPACA"), as applied to Petitioners, violate the United States Constitution by mandating American citizens to purchase health insurance, since the government does not have the authority to require citizens to buy any good or service as a condition of lawful residence in the United States. Indeed, a mandate to enter into a contract with an insurance company would be the first use of the Commerce Clause to universally mandate an activity by all citizens of the United States. If this legal precedent is established, Congress would have the unlimited power to regulate, prohibit, or mandate any or all activities in the United States. Such a doctrine would abolish any limit on federal power and alter the fundamental relationship of the national government to the states and the people.

### 22.

On March 23, 2010, a new universal healthcare regime, titled the "Patient Protection and Affordable Care Act," was signed into law by President Barack Obama.

### 23.

The PPACA represents an unprecedented encroachment on the liberty of individuals by mandating, *inter alia*, that all citizens and legal residents of the United States have

qualifying healthcare coverage or pay a penalty. By imposing such a mandate, the PPACA exceeds the powers of the United States Government under Article I of the Constitution and violates the Tenth Amendment to the Constitution.

### 24.

In addition, the tax penalty required under the PPACA, which must be paid by uninsured citizens and residents, constitutes an unlawful capitation or direct tax, in violation of Article I, sections 2 and 9 of the Constitution of the United States.

### 25.

Defendants are seriously intent on enforcing the challenged statutory individual mandate found and described in Count I of the petition.

### 26.

Petitioners and all others similarly situated are directly subject to the PPACA's individual mandate because they do not possess any form of health insurance and are, as such, classified as uninsured. Moreover, Petitioners do not desire and have no intention to obey what they consider to be an unconstitutional individual mandate found and described in Count I of the petition.

### 27.

The individual mandate's future effective date, which is definite, does not deprive Petitioners of standing or violate the requirement of ripeness since there are threatened injuries to Petitioners of having to plan for, invest, save and exhaust the personal resources required as a result of incurring the impending expense of purchasing healthcare insurance or, in the alternative, to pay a significant monetary penalty for disobeying the PPACA. Since Petitioners allege direct economic harm from the PPACA's impending mandate, standing to assert their claims clearly exists. *See, e.g., Okpalobi v. Foster*, 190 F.3d 337, 350 (5th Cir. 1999). For the purpose of Petitioners' Constitutional challenge to the PPACA's imminent individual mandate, there need be no detailed factual development because the questions presented are purely legal. Petitioners simply desire an adjudication of their rights, duties and obligations under the PPACA before their injuries are fully and finally consummated.

Since Petitioners have alleged an intention to engage in a course of conduct affected with a constitutional interest, but proscribed by the PPACA, and there exists a credible threat of penalty thereunder, they should not be required to await and undergo punishment as the sole means of seeking relief. *See, e.g., Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979). The Constitutional violations about which Petitioners complain will clearly be redressed by a favorable decision of the court.

**28.**

The concrete and future threat of injuries and burdens of complying with or being punished by the PPACA's regulatory scheme and individual mandate are presently causing actual and well-founded worry, fear and anguish on the part of Petitioners.

**IV.**

## **GENERAL ALLEGATIONS**

**29.**

It is axiomatic that "our Constitution establishes a system of dual sovereignty between the states and the federal Government." *See Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). The Supreme Court recognized and affirmed this fundamental principle from the earliest days of the Republic, as Chief Justice Marshall famously observed: "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803).

**30.**

Our system of dual sovereignty is reflected in numerous constitutional provisions, and not only those, like the Tenth Amendment, that speak to the point explicitly. In fact, the concept of state sovereignty is implicit in the Constitution's conferral upon Congress of not all governmental powers, but only the few, discrete and enumerated ones contained in Article I, Section 8.

**31.**

It is an implication rendered express by the Tenth Amendment's assertion that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the

States, are reserved to the States respectively, or to the people."  The Tenth Amendment affirms the undeniable notion that under our Constitution, the federal government is one of enumerated, hence limited, powers. *See, e.g., McCulloch v. Maryland*, 4 (Wheat.) 316, 405 (1819) ("This government is acknowledged by all to be one of enumerated powers").  Stated another way, "[t]he powers delegated by the . . . Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." *The Federalist No. 45* (James Madison) (Clinton Rossiter ed., 1999).

### 32.

The structure of the Constitution reflects the federalist values of the document's framers and is inconsistent with any interpretation of the Commerce Clause that would grant Congress unlimited power.  The Constitution's framers constrained Congress's power to specific enumerated powers to guard against undue expansion of federal power.  Likewise, the framers rejected the concept of a central government that would act upon and through the states and instead designed a system in which the state and federal governments would exercise concurrent authority over the people, who were, in Alexander Hamilton's words, "the only proper objects of government."

### 33.

Accordingly, the federal government may act only where the Constitution authorizes it to do so. *See, e.g., New York v. United States*, 505 U.S. 144 (1992).  Founder James Madison emphasized the importance of limiting the lawmaking powers of the federal government in the *Federalist Papers*: "In the first place it is to be remembered that the general government is not to be charged with the whole power of making and administering laws.  Its jurisdiction is limited to certain enumerated objects." *The Federalist No. 14*, at 97 (James Madison) (Clinton Rossiter ed., 1999).

### 34.

By establishing a system of dual sovereignty and limited federal power, the framers sought to diffuse the arbitrary exercise of governmental authority in order to protect the people from tyranny.  As the United States Supreme Court reaffirmed in *Gregory*, "[t]he

'constitutionally mandated balance of power' between the states and the federal government was adopted by the framers to ensure the protection of 'our fundamental liberties.'" 501 U.S. at 458 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 572 (1985) (Powell, J., dissenting)); *see also Coleman v. Thompson*, 501 U.S. 722 (1991) (Blackmun, J., dissenting) ("federalism secures to citizens the liberties that derive from the diffusion of sovereign power"). Thus, by dividing power between the states and the federal government, our Constitution "reduce[s] the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. at 458.

**35.**

For this check against tyranny to work, however, there must be a healthy balance of power between the states and the federal government. *See Gregory*, 501 U.S. at 458; *New York v. United States*, 505 U.S. 144, 181 (1992).

**36.**

The great innovation of the Constitution's design was that "our citizens would have two political capacities, one state and one federal, each protected from incursion by the other." It has been properly described as "a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring).

**37.**

Much of the Constitution is concerned with setting forth the form of the federal government, and the courts have traditionally invalidated measures deviating from that form. The result may appear "formalistic" in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution "protects us from our own best intentions by dividing power among sovereigns and among branches of government precisely so that the majority may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." *New*

*York*, 505 U.S. at 187.  Indeed, "[t]his separation of the two spheres is one of the Constitution's *structural* protections of liberty."  *Printz v. U.S.*, 521 U.S. 898, 921 (1997) (emphasis added).

### 38.

Congress's power is not absolute; therefore, authority to enact the individual mandate must be found in one of its enumerated powers to be Constitutionally valid.  In the case *sub judice*, Congress has specifically crafted legislation that invokes the Commerce Clause as constitutional authority for Congress to impose the PPACA's mandates.  However, adopting the interpretation of the Commerce Clause suggested by Congress would forever eliminate aforementioned safeguards inherent in the Constitution, thereby making federal power unlimited.  An ambitious Congress should not be allowed, under the guise of regulating commerce, to destroy the federalist structure created by the Constitution's founders.  As Supreme Court Justice Anthony Kennedy explained in his concurring opinion in *United States v. Lopez*, "[w]ere the federal government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory."  *Lopez*, 514 U.S. at 578 (1995).

### 39.

Since *NLRB v. Jones & Laughlin Steel*, 301 U.S. 1 (1937), Congress has continued to usurp additional powers by pretending the Commerce Clause has virtually no limits.  It now considers the Commerce Clause the equivalent of a general regulatory power.  Until the Court replaces its existing Commerce Clause jurisprudence with a standard more consistent with the original understanding, we will continue to see Congress appropriating state police powers under the guise of regulating commerce.

### 40.

The immense power now claimed by Congress and the current administration does not comport with either the text or purpose of the Commerce Clause.  Specifically, the Constitution gives Congress the power "To regulate Commerce with foreign Nations, and

among the several States, and with Indian Tribes." *U.S. Const.* art. I § 8, cl. 3. It does not give Congress the power to regulate commerce and anything and everything having an effect thereon.

**41.**

In its application to domestic affairs, the Commerce Clause was written primarily to ensure the free flow of goods and services among the states and to preclude states from interfering with that commerce. While Congress's power to regulate activity under the Commerce Clause is without question very broad, it is not unlimited. *See, e.g., Wickard v. Filburn*, 317 U.S. 111, 125 (1942). When Congress legislates at what are, at best, the outer limits of its commerce power, meaningful judicial review of whether that exercise is within Congress's delegated powers is essential if our federal system is to be preserved.

**42.**

The inquiry into the meaning of the Commerce Clause begins with the text. *See Reid v. Covert*, 354 U.S. 1, 8 n.7 (1957) (where language of Constitution is clear and unambiguous it must be given its plain evident meaning). The meaning of the term "commerce" is already settled. In *Gibbons v. Ogden*, the Supreme Court explained that "commerce" encompasses more than simply traffic in commodities; it encompasses "intercourse." 22 U.S. (9 Wheat.) 1, 189-90 (1824). In other words, the term applies to the instrumentalities of commerce used to carry commodities from one place to another. The *Gibbons* definition of commerce is consistent with both the views of the founders and of the ordinary meaning of the term "commerce" at the time of the Constitution's drafting. *See* Richard A. Epstein, *The Proper Scope of the Commerce Power*, 73 Va. L. Rev. 1387, 1389 (1987).

**43.**

Importantly, the Commerce Clause expressly grants Congress the power to regulate commerce with foreign nations and with Indian tribes. Any activity that affects commerce of one category in some attenuated way would necessarily affect the other two categories. This result renders the separately enumerated categories redundant. The broad and expansive interpretation urged by the United States Government, therefore, contradicts the principle that

-12-

"the Commerce Clause draws a clear distinction between 'States' and 'Indian tribes.'" *See Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 191-92 (1989); *see* Epstein, *supra*, at 1393-94. Significantly, every activity affects commerce in some insignificant way. *See Lopez*, 2 F.3d at 1362. Had the Founders intended the commerce power to be unlimited, enumerating three categories of commerce for Congress to regulate would have been wholly unnecessary. *See Gibbons*, 22 U.S. (9 Wheat.) at 194-95.

### 44.

For Congress to regulate activity under the Commerce Clause, the activity itself must be commercial. As Supreme Court Justice Clarence Thomas wrote in *Lopez*, "the power to regulate 'commerce' can by no means encompass authority over mere gun possession, any more than it empowers the federal government to regulate marriage, littering, or cruelty to animals, throughout the 50 states. Our Constitution quite properly leaves such matters to the individual states, notwithstanding these activities' effects on interstate commerce." *Lopez*, 514 U.S. at 585 (Thomas, J., concurring).

### 45.

To empower the PPACA pursuant to Congress's broad interpretation of the Commerce Clause would render other constitutional provisions completely meaningless. Extending the Commerce Clause to reach any matter that affects commerce renders the enumerated powers nugatory. Indeed, the enumerated powers are all superfluous and without real effect if the commerce power extends to any matter that has any effect upon commerce. Such an interpretation would violate the traditional rule that the Constitution should not be interpreted to render other portions of the Constitution meaningless. *E.g., Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803).

### 46.

While an offense may be created and "punished by Congress, under its general authority to make all laws necessary and proper to execute their delegated constitutional powers," *United States v. Coombs*, 37 U.S. (12 Pet.) 72, 78 (1838), Congress may criminalize or make unlawful certain activity (not inactivity) under the necessary and proper clause only

when it is pursuing an end which is clearly within its enumerated powers. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 423 (1819); *see also Coombs*, 37 U.S. (12 Pet.) at 75. In other words, Congress may regulate a local activity only if its purpose comports with its delegated power to regulate commerce and the regulation is plainly adopted to its interstate commerce purpose.

### 47.

The Supreme Court has also made clear that Congress cannot exercise authority not granted to it under the pretext of exercising its enumerated powers. *See McCulloch*, 17 U.S. (4 Wheat.) at 423.

### 48.

The Supreme Court has recognized that "the mere fact that Congress has said when a particular activity shall be deemed to affect commerce does not preclude further examination by this Court." *Katzenbach v. McClung*, 379 U.S. 294, 303-04 (1964); *see also Hodel v. Virginia Surface Mining & Reclamation Assoc.*, 452 U.S. 264, 311 (1981) (Rehnquist, J., concurring).

### 49.

As such, the Court should not assume that facts exist to support Congressional action in regards to the PPACA. While courts properly assume a state of facts when assessing the rationality of legislative means, *see FCC v. Beach Communications*, 508 U.S. 307 (1993), this is because the necessary and proper clause grants Congress broad discretion to enact "all means which are appropriate, [and] which are plainly adapted to" a legitimate end. *See McCulloch*, 17 U.S. (4 Wheat.) at 421. But it does not extend to the question of the validity of the end itself. The extreme and unwarranted deference on the question of legislative ends urged by Congress is antithetical to a constitutional system which "created a federal Government of limited powers." *See Gregory*, 501 U.S. 452 at 457.

### 50.

Though some deference is certainly due Congress, if that were tantamount to treating Congress as the sole judge of the limits on its constitutional authority, no judicial review

would be needed or even possible, and the principle of enumerated powers would amount to an empty promise. The doctrine of deference has not yet rendered judicial review superfluous.

**51.**

As the foregoing demonstrates, Congress's power to declare activity unlawful under the Commerce Clause is limited by the scope of that power. Although the Supreme Court has sanctioned a broad use of the commerce power, its decisions nonetheless make clear that the Commerce Clause has real and substantial limits. Were it otherwise, it would be meaningless to speak of a "federal government of limited powers." *See Gregory*, 501 U.S. at 457.

**52.**

The "substantial economic effect" Commerce Clause cases since *Jones & Laughlin Steel* consistently refer to "activities." *See, e.g., Jones & Laughlin Steel*, 301 U.S. at 37 ("intrastate activities, by reason of close and intimate relation to interstate commerce, may fall within federal control"); *Darby*, 312 U.S. at 118 ("those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end"); *United States v. Wrightwood Dairy*, 315 U.S. 110, 119 (1942) ("intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power"); *Wickard*, 317 U.S. at 125 ("even if appellee's activity be local, and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce"); *Perez*, 402 U.S. at 150 ("activities affecting commerce"); *Lopez*, 514 U.S. at 558 ("three broad categories of activity that Congress may regulate under its commerce power"); *Morrison*, 529 U.S. at 698 ("three broad categories of activity") (quoting Lopez); *Raich*, 545 U.S. at 17 ("activities that substantially affect interstate commerce."). Consequently, in order to render conduct unlawful under the Commerce Clause, Congress must be regulating interstate commerce, not merely inactivity. Congress cannot, under the guise of regulating interstate commerce, legislate beyond its delegated authority. And Congress's regulation of intrastate activity must reach activity that has a real and "substantial

economic effect on interstate commerce." *See Perez*, 402 U.S. at 152 (quoting *Wickard*, 317 U.S. at 125). The individual mandate to purchase insurance, discussed *infra*, goes well beyond the bounds of the Commere Clause.

## V.

## COUNT ONE

## <u>INDIVIDUAL MANDATE IS UNCONSTITUTIONAL</u>

### 53.

Petitioners reallege, adopt, and incorporate by reference paragraphs 1 through 52 *supra* as though fully set forth herein.

### 54.

Most American citizens, including Petitioners, will be required to be insured or, in the alternative, pay a fine. The mandate takes effect in the year 2014. This "personal responsibility" provision of the legislation is more accurately known as the "individual mandate" because it commands all individuals to enter into a contractual relationship with a private insurance company. Surprisingly, an individual mandate to buy health insurance has been a component of most health care reform plans proposed over the years. Based on the premise that if everyone had health insurance, it is argued that health care costs would be spread equally among everyone, and the individual cost for health insurance would be reduced.

### 55.

Some in Congress have contended that the individual mandate rationale is similar to the policy justification for requiring all drivers to maintain automobile liability insurance as a pre-requisite to maintaining a drivers' license. But such an analogy is tenuous and stretches the bounds of common sense, at best. The purpose of state auto insurance mandates is to provide financial protection for others that an insured driver may harm, and not necessarily for the driver himself. Moreover, an auto insurance mandate is a conditional exchange for having a state issue the privilege of a driver's license. Simply put, a person is not mandated to have a driver's license or automobile insurance unless he wishes to drive his automobile

on public roads. Even more importantly from a Constitutional standpoint, state requirements differ from federal requirements since Congress does not possess a general police power, unlike the states.

## 56.

Under the PPACA, those without qualifying health insurance coverage will be subject to an individual mandate requiring the purchase of coverage from a private insurance company. If the mandate is not followed, then those without qualifying health insurance will be subject to what the PPACA expressly describes as a "penalty." The penalty will be phased in according to the following schedule: $95 in 2014, $325 in 2015, and $695 in 2016 for the flat fee or 1.0% of taxable income in 2014, 2.0% of taxable income in 2015, and 2.5% of taxable income in 2016. Beginning in 2016, the penalty will be increased annually by a cost-of-living adjustment, making it more progressive.

## 57.

The Congressional Budget Office ("CBO") acknowledged the unprecedented nature of an individual mandate when assessing the Clinton health care reform proposal of 1993: "A mandate requiring all individuals to purchase health insurance would be an unprecedented form of federal action. The government has never required people to buy any good or service as a condition of lawful residence in the United States. An individual mandate has two features that, in combination, make it unique. First, it would impose a duty on individuals as members of society. Second, it would require people to purchase a specific service that would have to be heavily regulated by the federal government." The CBO likewise observed that the only analogous mandate on individual behavior from the federal government on this level would be the registration provisions under the Selective Service Act. The authority to impose a selective service system and military draft, however, is founded under the Congressional Article I power to raise and support armies, not under the Commerce Clause utilized by Congress this case. *See* http://www.cbo.gov/ftpdocs/48xx/doc4816/doc38.pdf.

-17-

**58.**

The Congressional Research Service ("CRS"), an entity that traditionally expresses the most permissive view of Congressional Article I powers, when asked by the Senate Finance Committee to opine on whether the Constitution allows Congress to impose an individual mandate of this nature, expressed an uncertain position, noting that "[w]hether such a requirement would be constitutional under the Commerce Clause is perhaps the most challenging question posed by such a proposal, as it is a novel issue whether Congress may use this clause to require an individual to purchase a good or a service." Staman & Brougher, *Requiring Individuals to Obtain Health Insurance: A Constitutional Analysis* (2009), http://assets.opencrs.com/rpts/R40725_20090724.pdf (discussed *infra*).

**59.**

The purpose of Congress's compulsory individual mandate, coupled with arbitrary price ratios and controls, is to require persons to buy artificially high-priced policies to subsidize coverage for others as well as an industry overly burdened with other government costs and regulations.  Revenues paid by conscripted citizens to the insurance companies are needed to compensate for the increased costs imposed upon these companies and the health care industry by the myriad regulations of the PPACA.

**60.**

An individual mandate to enter into a contract with or buy a particular product from a private party, with penalties to enforce it, is unprecedented not just in scope but in kind.  It is also unconstitutional as a matter of first principles and under any reasonable reading of judicial precedents.

**61.**

Nowhere in the Constitution is Congress given the power to mandate that an individual enter into a contract with a private party or purchase a good or service.  There is simply no legislative or judicial precedent for this claim of congressional power.  Because this claim of power by Congress would literally be without precedent, it could only be upheld if the Supreme Court is willing to create a new constitutional doctrine.

**62.**

In the last seventy years, the Supreme Court has applied a relatively straightforward judicial test to determine whether a federal statute is within the commerce power of Congress. When evaluating a claim of power under the Commerce Clause, the Court proceeds with a two-pronged inquiry. First, the Court determines whether the entire class of regulated activity is within Congress's constitutional reach; and second, whether the petitioner is a member of that class.

**63.**

A long line of Supreme Court cases establishes that Congress may regulate three categories of activity pursuant to the commerce power. These categories were first summarized in *Perez v. United States*, 402 U.S. 146 (1971), and most recently reaffirmed in *Gonzales v. Raich*, 545 U.S. 1 (2005). First, Congress may regulate the "channels of interstate or foreign commerce" such as the regulation of steamship, railroad, highway, or aircraft transportation or prevent them from being misused, as, for example, the shipment of stolen goods or of persons who have been kidnapped. Second, the commerce power extends to protecting "the instrumentalities of interstate commerce," as, for example, the destruction of an aircraft, or persons or things in commerce, as, for example, thefts from interstate shipments." Third, Congress may regulate economic activities that "substantially affect interstate commerce."

**64.**

Under the first prong of its Commerce Clause analysis, the Supreme Court asks whether the class of activities regulated by the statute falls within one or more of these categories. Since an individual health insurance mandate is not even arguably a regulation of a channel or instrumentality of interstate commerce, it must either fit in the third category or none at all. Predictably, Congress has cited only this third basis as Constitutional authority for the PPACA. The new law asserts that: "[t]he individual responsibility requirement . . . is commercial and economic in nature, and substantially affects interstate commerce. . . . The requirement regulates activity that is commercial and economic in nature: economic and

financial decisions about how and when health care is paid for, and when health insurance is purchased."

**65.**

Contrary to the federal government's intent, the third category was not meant to afford Congress a pretextual excuse to regulate any activity that had any effect on commerce, however trivial.

**66.**

Significantly, the mandate imposed by the pending bills does not regulate or prohibit the economic activity of providing or administering health insurance.  Nor does it regulate or prohibit the economic activity of providing health care, whether by doctors, hospitals, pharmaceutical companies, or other entities engaged in the business of providing a medical good or service.  The health care mandate does not purport to regulate or prohibit activity of any kind, whether economic or noneconomic. To the contrary, it simply purports to "regulate" inactivity.  Regulating commerce, however, is distinctly different from requiring persons to engage in it.

**67.**

By its own plain terms, the individual mandate provision regulates the absence of action.  To uphold this power under its existing doctrine, the Court must conclude that an individual's failure to enter into a contract for health insurance is an activity that is "economic" in nature – that is, part of a "class of activity" that "substantially affects interstate commerce."

**68.**

Never in this nation's history has the commerce power been used to require a person to affirmatively engage in economic activity.  No decision of the Supreme Court has ever upheld such a claim of power.  Such a regulation of a "class of inactivity" is of a wholly different kind than any at issue in the Court's most expansive interpretations of the Commerce Clause.  Previous cases have all involved negative prohibitions on private conduct.  The affirmative individual mandate contained in the PPACA is substantially

different from a negative prohibition.

**69.**

A mandate to enter into a contract with an insurance company would be the first use of the Commerce Clause to universally mandate an activity by all citizens of the United States. If such a precedent is established, Congress would have the unlimited power to regulate, prohibit, or mandate any or all activities in the United States. Such a doctrine would abolish any limit on federal power and alter the fundamental relationship of the national government to the states and the people.

**70.**

By boldly asserting that the authority to regulate interstate commerce includes the power to regulate not merely voluntary activity that is commercial or even ancillary thereto but inactivity that is expressly designed to avoid entry into the relevant market, the federal government advocates a Constitutional doctrine that effectively removes any boundaries to Congress's commerce power.

**71.**

Even in wartime, when the production of material is crucial to national survival, Congress has never claimed such a power. For example, during World War II, no farmer was forced to grow food for the troops; no worker was forced to build tanks. While the federal government encouraged the public to buy its bonds to finance the war effort, it never mandated they do so. While Congress levied a military draft, it did so as necessary and proper to its enumerated power in Article I, sec. 8 "to raise and support armies," not its commerce power. What Congress did not and cannot do during a wartime emergency, with national survival at stake, it cannot do in peacetime simply to avoid the political cost of raising taxes to pay for new government programs.

**72.**

While Congress has used its taxing power to fund Social Security and Medicare, never before has it used its commerce power to mandate that an individual person engage in an economic transaction with a private company. Using commerce power to regulate the auto

industry is one thing; making everyone purchase an automobile is quite another.

**73.**

Although it has been argued that Congress has the power to enforce this mandate because the Constitution empowers the federal government to tax citizens, the particular tax at issue in this matter is acknowledged in the very text of the legislation to be a "penalty" meant to punish citizens for their refusal to purchase health insurance from a private company.  Properly defined, a penalty is "[a]n elastic term with many different shades of meaning; it involves [the] idea of punishment, corporeal or pecuniary, or civil or criminal, although its meaning is generally confined to pecuniary punishment." *Black's Law Dictionary* 1133 (6th ed. 1990). Central to the definition of penalty is the "idea of punishment" – "[p]unishment imposed on a wrongdoer . . . in the form of imprisonment or fine. Though usually for crimes, penalties are also sometimes imposed for civil wrongs." *Black's Law Dictionary* 1153 (7th ed. 1999).  Congress lacks the power under the Commerce Clause to punish citizens for their refusal to engage in the activity of purchasing health insurance.  Such punishment, meted out by our elected leaders, is an assault upon the values enshrined in our Constitution.

**74.**

Whether Congress describes the payment mechanism contained in the individual mandate a tax or a fine, it cannot so simply circumvent Constitutional proscriptions on its power.  Otherwise, it could evade all Constitutional limits on its authority by merely imposing the utilization of "taxes" whenever any individual or entity fails to follow a prescribed course of action.  In fact, the Supreme Court has already rejected a similar approach.  In *Child Labor Tax Case (Bailey v. Drexel Furniture Co.)*, 259 U.S. 20 (1922), the Court specifically ruled that Congress could not impose a "tax" in order to penalize conduct – the utilization of child labor – that it could not regulate under the Commerce Clause.  In so doing, the Court recognized, "[a]ll that Congress would need to do, hereafter, in seeking to take over to its control any one of the great number of subjects of public interest, jurisdiction of which the states have never parted with, and which are reserved to

them by the Tenth Amendment, *would be to enact a detailed measure of complete regulation of the subject and enforce it by a so-called tax upon departures from it.*  To give such magic to the word 'tax' would be to break down all constitutional limitation of the powers of Congress and completely wipe out the sovereignty of the states."  *Drexel*, 259 U.S. at 38 (emphasis added).

### 75.

To uphold the constitutionality of a health care individual mandate, the Court would have to find that a decision not to enter into a contract to purchase a good or service was an economic activity that, in the aggregate, substantially affects interstate commerce.  By this reasoning, every action or inaction could be characterized as "economic," thereby destroying any limitation on the commerce power of Congress.

### 76.

Because the personal insurance mandate purports to reach the refusal to engage in economic activity – which is both inactivity and noneconomic – the Court cannot uphold such an exercise of power without admitting that the Commerce Clause has no limits, a proposition it rejected in *Lopez* and *Morrison*, and from which the Supreme Court did not retreat in *Raich*.  *See Gonzales v. Raich*, 545 U.S. 1 (2005).

### 77.

Although Congress may arguably regulate select aspects of the health care industry or the health insurance industry in light of their substantial effect on interstate commerce, the PPACA's individual mandate regulates the noneconomic inactivity of not purchasing a particular service or entering into a contract. Individuals' decisions not to enter certain economic transactions have never before subjected them to the federal regulation of a market that they have chosen not to enter. The PPACA's individual mandate provision would have the effect of subjecting an individual's decisions to federal control by virtue of the fact that the person merely resides within the borders of the United States.

### 78.

Not only does the Commerce Clause fail to provide Congress with the authority to

impose the individual mandate, the compelled purchase of health insurance also constitutes the "taking" of private property under the Fifth Amendment to the United States Constitution. Requiring Petitioners to devote a penalty or a percent of their personal income for a purpose which they otherwise would not voluntarily choose based on individual circumstances is an arbitrary and capricious "taking" of property.

**79.**

Additionally, the United States Supreme Court has interpreted the Fifth and Fourteenth Amendments as granting substantive due process rights to American citizens. In this regard, the Supreme Court has concluded that due process protects against the transgression of personal immunities that are "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937); *see Sotto v. Wainwright*, 601 F.2d 184, 191 (5th Cir. 1979), *cert. denied*, 445 U.S. 950 (1980). Without question, implicit in the concept of ordered liberty is the right of a person to be free from purchasing a good or service the individual does not desire to purchase.

**80.**

In *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Supreme Court defined those "liberty" interests protected by the due process clause as follows: "While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration, and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer*, 262 U.S. at 399.

**81.**

Such liberty interests implicit within the substantive parameters of the due process clause include the right of an extended family to share a household, *Moore v. City of East Cleveland*, 431 U.S. 494 (1977); the right of a woman to decide whether to have an abortion,

*Roe v. Wade*, 410 U.S. 113 (1973); the freedom to marry a person of another race, *Loving v. Virginia*, 388 U.S. 1 (1967); the right to vote, *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966); the right to use contraceptives, *Griswold v. Connecticut*, 381 U.S. 479 (1965); the right of access to the courts, *NAACP v. Button*, 371 U.S. 415 (1963); the right of association, *NAACP v. Alabama*, 357 U.S. 449 (1958); the right to send children to private schools, *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); and the right to have children instructed in foreign language, *Meyer v. Nebraska*, 262 U.S. 390 (1923).

**82**.

For the purposes of a substantive due process analysis there is no meaningful distinction between a person who asserts the right to contract or associate with another private entity and a person who asserts the right not to enter a contract or to associate with another private entity.  Refusal to enter into a contract in the face of an illegitimate demand for a contract is subject to protection under the Fifth and Fourteenth Amendments to the United States Constitution.  Just as a person has a First Amendment Constitutional right, in certain circumstances, to be free from exercising freedom of speech, Petitioners in this matter have the Constitutional right to be free from entering a private contract or an involuntary association.

**83.**

Moreover, compelling Petitioners to enter into a private contract to purchase insurance from another entity will legally require them to share private and personal information with the contracting party.  Specifically, by requiring Petitioners to abide by the PPACA's individual mandate, Congress is also compelling Petitioners to fully disclose past medical conditions, habits and behaviors.  Not only will the insurer be privy to all past medical information, Congress's individual mandate will, by necessity, allow the compelled insurer access to Petitioners' present and future medical information of a confidential nature.  If judicially enforceable privacy rights mean anything, then private and confidential medical details certainly merit Constitutional protection.  Petitioners should not be forced to disclose the most intimate details of their past, present and future medical information.

**84.**

The PPACA's individual mandate expressly violates Petitioners fundamental rights they enjoy as part of the "liberty" interest under the Fifth Amendment. Fundamental rights such as "the right to make one's own health care decisions," "the right to abstain from entering into a contractual relationship with another private entity" and "the right to not be compelled to divulge private medical information to another private entity" are deeply rooted in American history and tradition and implicated by the imposition of the PPACA. The new law's individual mandate represents an abuse of Congressional authority and a clear violation of substantive due process protections, since Petitioners benefit from a constitutionally protected interest in making certain kinds of important decisions free from governmental compulsion. The right to privacy judicially developed pursuant to the Fifth and Fourteenth Amendments can be understood only by considering both the Petitioners' collective interest and the nature of the federal government's interference with it. In short, a judicially recognized right to privacy protects Petitioners from unduly burdensome interference with their freedom to decide whether to voluntarily purchase health insurance.

**85.**

Federalization of "inactivity" imposes a significant threat to the states' sovereign choices and individual liberty. Many states have exercised their "sovereign right to adopt in [their] own Constitution[s] individual liberties more expansive than those conferred by the federal Constitution." *See PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81 (1980).

**86.**

The Court should not devise any new doctrines by which to uphold an individual health insurance mandate. First and foremost, as already mentioned, to uphold this exercise of power, the Court would have to affirm for the first time in its history that Congress has a general or plenary police power, a position expressly rejected by the Constitution and a finding the Supreme Court has repeatedly refused to take.

## VI.

## COUNT TWO

## VIOLATION OF CONSTITUTIONAL PROHIBITION OF UNAPPORTIONED CAPITATION OR DIRECT TAX

### 87.

Petitioners reallege, adopt, and incorporate by reference paragraphs 1 through 86 *supra* as though fully set forth herein.

### 88.

The tax penalty on uninsured persons under the PPACA constitutes a capitation and a direct tax that is not apportioned among the states according to census data, thereby injuring the sovereign interests of Petitioners.

### 89.

Said penalty tax applies without regard to property, profession, or any other circumstance and is unrelated to any taxable event or activity. It is to be levied upon persons for their failure or refusal to do anything other than to exist and reside within the United States. Because the penalty tax is not predicated on any actual event, thing, or action, the individual mandate represents a capitation tax that is not properly apportioned per Article I section 9 clause 4.

### 90.

By its imposition of the penalty tax, the PPACA injures the State of Mississippi's interest as a sovereign vested with exclusive authority, except to the extent permitted to the federal government by the Constitution, to make all taxing decisions affecting its citizens and to confer a right upon persons in the State to make health care decisions without government interference. The tax penalty is unconstitutional on its face and cannot be applied constitutionally.

## VII.

## COUNT THREE

## VIOLATION OF FEDERAL-STATE RELATIONSHIP AND LOSS OF GOVERNMENT EMPLOYEE DISCRETION (Lt. Gov. Phil Bryant, in his Individual Capacity)

### 91.

Petitioners reallege, adopt, and incorporate by reference paragraphs 1 through 90 *supra* as though fully set forth herein.

### 92.

The State of Mississippi is an employer subject to provisions of the PPACA mandating that the State provide a health insurance plan to its employees that conforms to the rules provided in the PPACA and the regulations promulgated thereunder. Prior to enactment of the PPACA, the State of Mississippi, as an employer, was free to choose the health insurance plans it offered to its employees, and employees were free to choose from one or more plans offered by the State of Mississippi, or to purchase a health insurance plan on the private market that does not conform to the new federal regulations, or even to not be covered by any health insurance plan at all. Pursuant to the PPACA, Congress has chosen to unconstitutionally regulate exactly what healthcare plans employers like the State of Mississippi must offer and what healthcare plans that its employees must accept.

### 93.

Employees of the State of Mississippi will be forced by Congress to purchase health insurance either from their employer or in the private market, with similar penalties for noncompliance as discussed *supra*. Consequently, State employees are directly affected and commandeered by the PPACA, since the law necessarily substitutes the judgment of Congress and the Executive branches of the federal government for that of the employees and their employer, which is a State government, regarding the composition of health insurance plans that may be offered to and accepted or rejected by employees.

**94.**

State employees will clearly suffer a deprivation of liberty, in that they may no longer exercise the discretion to choose a healthcare plan that does not conform to the PPACA's mandates either from their employer or on the open market. Congress has therefore chosen to regulate personal decisions in a way that deprives employees of a liberty interest and that exceeds Congress' power under the Commerce Clause. Such an approach amounts to an unconstitutional commandeering of State government.

**95.**

The PPACA will convert what previously had been a voluntary federal-state partnership into a compulsory top-down federal program in which the discretion of the Petitioner Bryant, the State of Mississippi and its government employees is removed, in derogation of the core constitutional principle of federalism upon which the Republic was founded. In so doing, the PPACA exceeds the powers of Congress and violates the Tenth Amendment to the Constitution.

**96.**

Petitioner Bryant, as Mississippi's Lieutenant Governor, is an employee of the State of Mississippi who brings this cause of action in his individual capacity as a private citizen and an employee rather than as an elected official of the State of Mississippi. As a government employee, Petitioner Bryant is directly injured by the PPACA's mandate that the State of Mississippi offer health insurance plans to its employees that conform solely to the judgment of the federal government of the United States, heedless of the desires of the employer or employees. He is further injured by the enactment of the individual mandate, because he now cannot choose to drop the federally mandated plan that his employer must offer in favor of non-insurance without incurring penalties imposed by Congress.

**VIII.**

## CLASS ALLEGATIONS

**97.**

First, Petitioners bring this action as individuals and as a statewide class action

pursuant to Fed. R. Civ. P. 23. Petitioners' petition, which alleges class-wide unconstitutional activity is particularly well suited for 23(b)(2) treatment since the common claim is susceptible to a single proof and subject to a single injunctive. Petitioners qualify for an Injunctive and Declaratory Class Under Rule 23(b)(2)on behalf of a class defined as follows:

(a)    All persons in Mississippi who fall within the purview of the PPACA and who therefore will be required, as part of the law's individual mandate, to purchase health insurance;

(b)    All persons in Mississippi who will be prosecuted or otherwise penalized for their inactivity and/or refusal enter into a contract for the purchase of health insurance as mandated by the PPACA;

(c)    The class excludes all persons who, at the time this Complaint is filed, do not fall under the purview of the PPACA or who have already instituted individual litigation in Mississippi seeking similar relief against Defendants on the basis of the circumstances described in the above-referenced paragraphs.

Second, Petitioners seek to establish a class or sub-class encompassing governmental employees of the State of Mississippi. Specifically, Petitioner Lt. Gov. Phil Bryant, in his individual capacity, brings an individual action and a statewide class or sub-class action pursuant to Fed. R. Civ. P. 23. His claims allege class-wide unconstitutional activity on behalf of all Mississippi state employees and is particularly well suited for 23(b)(2) treatment since the common claim is susceptible to a single proof and subject to a single injunctive. Petitioner Bryant's class or sub-class would represent a request for Injunctive and Declaratory relief on behalf of a class or sub-class defined as follows:

(a)    All government employees of the State of Mississippi who fall within the purview of the PPACA and who currently possess healthcare insurance as part of their employment with the State.

(b)    All government employees of the State of Mississippi who will be adversely affected by the PPACA's implementation.

(c)     This class or sub-class excludes all persons who, at the time this Complaint is filed, do not fall under the purview of the PPACA or who have already instituted individual litigation in Mississippi seeking similar relief against Defendants on the basis of the circumstances described in the above-referenced paragraphs.

**98.**

Those persons excluded from the class by subparagraphs (c) of paragraph 97, *supra*, may opt into the class at any time, but not later than ten (10) days prior to the final hearing regarding injunctive issues against Defendants.  Exercise of this opt-in right will require some affirmative act by the person or an attorney of the person, such as by filling out and mailing an opt-in notice listing by name all persons who wish to opt into the class.  All persons who are excluded from the class by subparagraphs (c) or paragraph 97, *supra*, who do not affirmatively opt into the class by the specified date will not be bound by the class.

**99.**

Petitioners are members of the class they seek to represent.  Moreover, Petitioners' interests coincide with, and are not antagonistic to, those of the other class members.  Petitioners' claims are typical of the claims of the other class members, and Petitioners will fairly and adequately protect the interests of the class.

**100.**

Specifically, and without limitation, the following questions of law and fact are common to all class members: whether Defendants have the Constitutional authority to mandate class members to purchase health insurance and incur health insurance premiums, or in the alternative, to subject class members to a monetary penalty.  As to Petitioner Bryant's class or sub class, without limitation, the following questions of law and fact are common to all class or sub-class members: whether Defendants have the Constitutional authority to substitute the judgment of Congress and the Executive branches of the federal government for that of another government's employees and their employer, which is a State government, regarding the composition of health insurance plans that may be offered to and

voluntarily accepted or rejected by employees.

**101.**

The claims of the representative Petitioners named herein are typical of the claims of the class.

**102.**

The Petitioner class is so numerous that joinder of all members is impracticable.

**103.**

Prosecution of separate actions by individual class members will create the risk of inconsistent or varying adjudications with respect to individual class members which would establish incompatible standards of conduct for the Defendants and would also, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or which would substantially impair or impede such members' abilities to protect their interests.

**104.**

Defendants have acted on grounds generally applicable to the class, thereby making appropriate relief with respect to the class as a whole.

**105.**

The questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**106.**

Rule 23(b)(2) actions are not "opt-out" classes and notice is not mandatory in such cases.

**IX.**

**COUNT FOUR**

**<u>DECLARATORY JUDGMENT</u>**

**107.**

Petitioners reallege, adopt, and incorporate by reference paragraphs 1 through 106

-32-

above as though fully set forth herein.

**108.**

There is an actual controversy of sufficient immediacy and concreteness relating to the legal rights and duties of the Petitioners and their legal relations with the Defendants to warrant relief under 28 U.S.C. §§ 2201.

**109.**

The harm to the Petitioners as a direct result of the PPACA is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal relations of the parties.

**X.**

**CLAIMS FOR RELIEF**

**110.**

As a direct and proximate result of Defendants' conduct, Petitioners, including the Petitioner class, are entitled to the following relief:

(a)   Injunctive relief as this Court deems appropriate to declare unconstitutional and therefore eliminate the PPACA's individual mandate that persons enter into a private contract to purchase healthcare insurance;

(b)   A declaration of Petitioners' rights, duties and obligations under the PPACA; specifically, as to whether Petitioners must purchase healthcare insurance or be required by the federal government to pay a monetary or criminal penalty;

(c)   Reasonable attorney's fees and costs to Petitioners pursuant to 28 U.S.C. § 2412 or any other applicable statutory provision;

(d)   Such other and further relief as this court deems appropriate; and

(e)   Interest and costs of this action, including costs of notice to class members, if required, and all related expenses of processing class members' claims.

**WHEREFORE**, Petitioners respectfully request this Court to grant the relief

-33-

requested in the preceding paragraphs.

Respectfully submitted,

RYAN S. WALTERS, MICHAEL E. SHOTWELL AND RICHARD A. CONRAD, ON BEHALF OF THEMSELVES AND OTHERS SIMILARLY SITUATED, PETITIONERS

By:  /s/ Christopher B. McDaniel
**CHRISTOPHER B. McDANIEL**

By:  /s/ K. Douglas Lee
**K. DOUGLAS LEE**

**CHRISTOPHER B. McDANIEL, MSB #10711**
**BRETT W. ROBINSON, MSB #10006**
**ROY A. NOWELL, JR., MSB #100768**
**HORTMAN HARLOW BASSI ROBINSON**
**   & McDANIEL, PLLC**
**POST OFFICE DRAWER 1409**
**LAUREL, MS 39441-1409**
**PHONE:  (601) 649-8611**
**FAX:  (601) 649-6979**
**cmdaniel@hortmanharlow.com**
**brobinson@hortmanharlow.com**
**rnowell@hortmanharlow.com**
**Attorney for Petitioners**

**K. DOUGLAS LEE, MSB #9887**
**22 MILBRANCH ROAD**
**BLDG. NO. 100**
**HATTIESBURG, MS 39402**
**PHONE:  (601) 583-4447**
**FAX:  (601) 450-0152**
**kdl@leelaw.us**
**Attorney for Petitioners**