**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**HATTIESBURG DIVISION**

| | | |
|---|---|---|
| LT. GOV. PHIL BRYANT et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10-cv-76-KS-MTP |
| | ) | |
| ERIC H. HOLDER, JR., in his official capacity | ) | |
| as Attorney General of the United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. ................................................................................. iv

INTRODUCTION ............................................................................................... 1

STATUTORY BACKGROUND ............................................................................. 5

ARGUMENT. ..................................................................................................... 8

I.    Plaintiffs' Claims Should Be Dismissed for Lack of Subject Matter Jurisdiction ............. 8

    A.    Plaintiffs Lack Standing Because They Have Alleged No Cognizable
        Injury Fairly Traceable to the Minimum Coverage Provision. .............................. 8

    B.    Plaintiffs Cannot Evade the Procedures Prescribed in the Anti-Injunction
        Act for an Individual to Contest a Liability under the Minimum
        Coverage Provision. ....................................................................................... 11

    C.    Plaintiffs' Claim Is Not Ripe for Review ........................................................... 13

II.   This Action Should Be Dismissed for Failure to State a Claim. ...................................... 15

    A.    The Comprehensive Regulatory Measures of the ACA, Including the
        Minimum Coverage Provision, Are a Proper Exercise of Congress's Powers
        Under the Commerce Clause and the Necessary and Proper Clause. .................... 15

        1.    Congress's Authority to Regulate Interstate Commerce Is
            Broad and the Court's Review Is Deferential. ......................................... 16

        2.    The ACA, and the Minimum Coverage Provision, Regulate
            the Interstate Market in Health Insurance. ................................................ 19

        3.    The Provision Is Integral to the Larger Regulatory Scheme. .................... 21

        4.    The Regulated Conduct Substantially Affects Interstate
            Commerce. ............................................................................................... 24

    B.    The Minimum Coverage Provision Is a Valid Exercise of Congress's
        Independent Power Under the General Welfare Clause ....................................... 28

    C.    Plaintiffs' Takings Claim Is Premature and Cannot Prevail. ............................... 31

    D.    The Minimum Coverage Provision Does Not Violate Substantive
        Due Process ................................................................................................... 33

E.   The Minimum Coverage Provision Does Not Impose an
Unconstitutional Unapportioned Capitation or Direct Tax.................................. 39

F.   Lieutenant Governor Bryant Lacks Standing To Assert a
Tenth Amendment Claim, and No Such Claim Can Prevail. .............................. 41

CONCLUSION. .................................................................................................................. ..45

# TABLE OF AUTHORITIES

## Cases

*A. O. Smith Corp.* v. *FTC*, 530 F.2d 515 (3d Cir. 1976)............................................ 14

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)................................................. 13, 14

*Acara* v. *Banks*, 470 F.3d 569 (5th Cir. 2006). ............................................ 38

*Adair* v. *United States*, 208 U.S. 161 (1908). .............................................. 34

*Atlas Corp.* v. *United States*, 895 F.2d 745 (Fed. Cir. 1990) ....................... 32

*Babbitt* v. *United Farmer Workers Nat'l Union*, 442 U.S. 289 (1979)......................... 9

*Bartley* v. *United States*, 123 F.3d 466 (7th Cir. 1997). ................................ 12

*Benning* v. *Georgia*,
    391 F.3d 1299 (11th Cir. 2004). ......................................................... 44

*Bethlehem Steel Corp.* v. *EPA*, 536 F.2d 156 (7th Cir. 1976). ..................... 14

*Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723 (1975)...................... 10

*Blum*  v. *Yaretsky*, 457 U.S. 991 (1982).................................................. 36

*Bob Jones Univ.* v. *Simon*, 416 U.S. 725 (1974). ................................... 12, 30

*Branch* v. *United States*, 69 F.3d 1571 (Fed. Cir. 1995) .......................... 33

*Brooklyn Legal Servs. Corp.* v. *Legal Servs. Corp.*,
    462 F.3d 219 (2d Cir. 2006), *cert. denied*, 552 U.S. 810 (2007)............... 42

*Buckley* v. *Valeo*, 424 U.S. 1 (1976)................................................... 31

*Cantu-Delgadillo v. Holder*, 584 F.3d 682 (5th Cir. 2009). ..................... 33, 34

*Chavez* v. *Martinez*, 538 U.S. 760 (2003)............................................ 34

*Child Labor Tax Case (Bailey* v. *Drexel Furniture Co.)*, 259 U.S. 20 (1922). .......... 29

*Citizens for Health* v. *Leavitt*, 428 F.3d 167 (3d Cir. 2005)........................ 36

*Commonwealth Edison Co.* v. *United States*, 271 F.3d 1327 (Fed. Cir. 2001). .......... 32

-iv-

*Concrete Pipe & Prods.* v. *Constr. Laborers Pension Trust*, 508 U.S. 602 (1993). ............. 34, 35

*Cornish* v. *Corr. Serv. Corp.*, 402 F.3d 545 (5th Cir. 2005). .................................... 36

*Daniel* v. *Paul*, 395 U.S. 298 (1969). ...................................................... 28

*Dolan* v. *City of Tigard*, 512 U.S. 374 (1994). ........................................... 31

*EEOC* v. *Wyoming*, 460 U.S. 226 (1983). ................................................ 45

*E. Enters. v. Apfel,* 524 U.S. 498 (1998)................................................... 32

*Energy Mgmt Corp.* v. *City of Shreveport*, 467 F.3d 471 (5th Cir. 2006). .................. 35

*Fadjo v. Coon*, 633 F.2d 1172 (5th Cir. 1981). ........................................... 39

*Figueroa* v. *United States*, 466 F.3d 1023 (Fed. Cir. 2006). .............................. 39

*GDF Realty Invs., Ltd.* v. *Norton*, 326 F.3d 622 (5th Cir. 2003)........................... 17

*Garcia* v. *San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).......................... 45

*Goetz v. Glickman*, 149 F.3d 1131 (10th Cir. 1998) ...................................... 40

*Gonzales* v. *Raich*, 545 U.S. 1 (2005)................................................... *passim*

*Groome Res. Ltd.* v. *Parish of Jefferson*, 234 F.3d 192 (5th Cir. 2000).................. 17, 21

*Head Money Cases (Edye v. Robertson),* 112 U.S. 580 (1884). ............................ 40

*Heart of Atlanta Motel* v. *United States*, 379 U.S. 241 (1964).......................... 28

*Helvering* v. *Davis*, 301 U.S. 619 (1937). ............................................... 29

*Hodel* v. *Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981)................. 24

*Hylton* v. *United States*, 3 U.S. (3 Dall.) 171 (1796)..................................... 40

*Int'l Longshoremen's & Warehousemen's Union* v. *Boyd*, 347 U.S. 222 (1954)........... 14

*J.F. Shea Co., Inc.* v. *City of Chicago*, 992 F.2d 745 (7th Cir. 1993). ...................... 42

*Knowlton* v. *Moore*, 178 U.S. 41 (1900).............................................. 29, 41

*License Tax Cases,* 72 U.S. (5 Wall.) 462 (1867)3, 2 .................................... 3, 29

*Lincoln Fed. Labor Union v. Nw. Iron & Metal Co.*, 335 U.S. 525 (1949)................................. 34

*Lingle* v. *Chevron U.S.A. Inc.*, 544 U.S. 528 (2005). ............................................. 31-32

*Linn* v. *Chivatero*, 714 F.2d 1278 (5th Cir. 1983). .................................................... 12

*Lujan* v. *Defenders of Wildlife*, 504 U.S. 555 (1992). ................................................. 8

*M'Culloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316 (1819). ............................................ 24

*Massachusetts v. Mellon*, 262 U.S. 447 (1923). ...................................................... 1

*McConnell* v. *FEC*, 540 U.S. 93 (2003). .......................................................... 9, 11

*McNeil v. United States*, 78 Fed. Cl. 211 (2007) .................................................... 33

*Medeiros* v. *Vincent*, 431 F.3d 25 (1st Cir. 2005), *cert. denied*, 548 U.S. 904 (2006). .............. 42

*Miller* v. *Nissan Motor Acceptance Corp.*, 362 F.3d 209 (3d Cir. 2004). ................................. 10

*Montagne v. United States*, 90 Fed. Cl. 41 (2009) ................................................... 33

*Moon v. Freeman*, 379 F.2d 382 (9th Cir. 1967) ..................................................... 40

*Moreau* v. *Harris County*, 158 F.3d 241 (5th Cir. 1998)............................................. 45

*Montagino* v. *Canale*, 792 F.2d 554 (5th Cir. 1986). ................................................. 35

*Murphy Oil USA, Inc.* v. *Wood*, 438 F.3d 1008 (10th Cir. 2006). ................................... 42

*Nat'l Family Planning & Reprod. Health Ass'n* v. *Gonzales*, 468 F.3d 826 (D.C. Cir. 2006). ... 11

*Nat'l Treasury Employees Union* v. *U.S. Dep't of Treasury*, 25 F.3d 237 (5th Cir. 1994).... 36, 39

*Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359 (1941)............................................... 30

*New York* v. *United States*, 505 U.S. 144 (1992)............................................... 17, 44

*Nixon* v. *Adm'r of Gen. Servs.*, 433 U.S. 425 (1977). ............................................... 38

*Nunez* v. *Pachman*, 578 F.3d 228 (3d Cir. 2009). .................................................... 38

*Okpalobi* v. *Foster*, 190 F.3d 337 (5th Cir. 1999). .................................................. 10

*Oregon* v. *Legal Servs. Corp.*, 552 F.3d 965 (9th Cir. 2009). ..................................... 42

*Pac. Ins. Co.* v. *Soule*, 74 U.S. 443 (1868). ....................................................... 40

*Pagan* v. *Calderon*, 448 F.3d 16 (1st Cir. 2006). ...................................... 42

*Plante v. Gonzalez*, 575 F.2d 1119 (5th Cir. 1978) . ............................... 37

*Poe* v. *Ullman*, 367 U.S. 497 (1961)................................................................ 8

*Priester v. Lowndes County*, 354 F.3d 414 (5th Cir. 2004). ..................... 35

*Reno* v. *Condon*, 528 U.S. 141 (2000)............................................................ 44

*Roark & Hardee LP* v. *City of Austin*, 522 F.3d 533 (5th Cir. 2008). .................... 9, 13

*Rodgers* v. *United States*, 138 F.2d 992 (6th Cir. 1943)............................. 40

*SRM Chem. Ltd., Co.* v. *Fed. Mediation & Conciliation Serv.*,
    355 F. Supp. 2d 373 (D.D.C. 2005). .................................................. 32

*Sabri* v. *United States*, 541 U.S. 600 (2004)................................................ 24

*Sanner v. Bd. of Trade*, 62 F.3d 918 (7th Cir. 1995). ............................... 10, 11

*Sonzinsky v. United States*, 300 U.S. 506 (1937) ...................................... 30

*South Carolina ex rel. Tindal v. Block*, 717 F.2d 874 (4th Cir. 1983) ......................... 40

*South Dakota* v. *Dole*, 483 U.S. 203 (1987). ................................................ 29

*Steel Co.* v. *Citizens for a Better Env't.*, 523 U.S. 83 (1998)......................... 1

*Summers v. Earth Island Inst.*, 129 S. Ct. 1142 (2009). ............................. 1, 11

*Summe* v. *Kenton County Clerk's Office*, 604 F.3d 257 (6th Cir. 2010)...................... 38

*Swisher Intern., Inc.* v. *Schafer*, 550 F.3d 1046 (11th Cir. 2008)................ 32

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)............. 18

*Tenn. Elec. Power Co. v. Tenn Valley Auth.,* 306 U.S. 118 (1939)............. 42

*Texas* v. *United States*, 523 U.S. 296 (1998). ............................................... 14

*Thomas* v. *Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985)............................................. 13

*Toilet Goods Ass'n* v. *Gardner*, 387 U.S. 158 (1967)................................................ 13

*Travelers Ins. Co.* v. *Marshall*, 634 F.2d 843 (5th Cir. 1981)...................................... 34

*Tyler* v. *United States*, 281 U.S. 497 (1930).......................................................... 4, 41

*United States* v. *Bailey*, 115 F.3d 1222 (5th Cir. 1997)........................................... 17

*United States v. Bird*, 124 F.3d 667 (5th Cir. 1997), *cert. denied*, 523 U.S. 1006 (1998), *reaff'd by* 401 F.3d 633 (5th Cir.), *cert. denied*, 126 S. Ct. 250 (2005) ................................ 17

*United States* v. *Brockway*, 769 F.2d 263 (5th Cir. 1985)........................................... 42

*United States* v. *Comstock*, 130 S. Ct. 1949 (2010)................................................. 24

*United States* v. *Darrington*, 351 F.3d 632 (5th Cir. 2003)....................................... 45

*United States* v. *Hacker*, 565 F.3d 522 (8th Cir. 2008), *cert. denied*, 130 S. Ct. 302 (2009)...... 42

*United States* v. *Johnson*, 652 F. Supp. 2d 720 (S.D. Miss. 2009)............................. 42

*United States* v. *Kahriger*, 345 U.S. 22 (1953)  ..................................................... 30

*United States* v. *Lopez*, 514 U.S. 549 (1995)................................................... 17, 18, 19

*United States* v. *Mfrs. Nat'l Bank of Detroit*, 363 U.S. 194 (1960). ......................... 4, 41

*United States* v. *Miss. Dep't of Pub. Safety*, 321 F.3d 495 (5th Cir. 2003). ................ 45

*United States* v. *Morrison*, 529 U.S. 598 (2000). ............................................... 18, 19

*United States v. Ogba*, 526 F.3d 214 (5th Cir. 2008). ........................................... 25

*United States* v. *Parker*, 362 F.3d 1279 (10th Cir.), *cert. denied*, 543 U.S. 874 (2004). ........... 42

*United States* v. *Raines*, 362 U.S. 17 (1960). ..................................................... 14

*United States* v. *S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944)............................... 19

*United States* v. *Salerno*, 481 U.S. 739 (1987)................................................... 15

*United States* v. *Sanchez*, 340 U.S. 42 (1950). ................................................. 4, 29

*United States* v. *Sperry Corp.*, 493 U.S. 52 (1989). ..................................................... 32

*United States v. Stangland*, 242 F.2d 843 (7th Cir. 1957) ............................................. 40

*Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976). ............................................. 34

*Utah Shared Access Alliance* v. *Carpenter*,
  463 F.3d 1125 (10th Cir. 2006), *cert. denied*, 550 U.S. 904 (2007). ...................... 11

*Warren* v. *United States*, 874 F.2d 280 (5th Cir. 1989). ............................................... 12

*Wash. State Grange* v. *Wash.  State Republican Party*, 552 U.S. 442 (2008). ............ 15

*Washington* v. *Glucksberg*, 521 U.S. 702 (1997). .................................................. 33-34

*Whalen* v. *Roe*, 429 U.S. 589 (1977). ..................................................................... 38, 39

*W. Coast Hotel Co.* v. *Parrish*, 300 U.S. 379 (1937). ................................................. 34

*Whitmore* v. *Arkansas*, 495 U.S. 149 (1990). ............................................................... 9

*Wickard* v. *Filburn*, 317 U.S. 111 (1942). ......................................... 16, 18, 27, 28, 39

*Williamson* v. *Lee Optical*, 348 U.S. 483 (1955). ...................................................... 35

*Wilson* v. *Collins*, 517 F.3d 421 (6th Cir. 2008). ....................................................... 37

*Woods* v. *Holy Cross Hosp.*, 591 F.2d 1164 (5th Cir. 1979). ..................................... 34

## Statutes

26 U.S.C. § 4980B. ........................................................................................................ 29

26 U.S.C. § 4980D ......................................................................................................... 29

26 U.S.C. § 4980H. ........................................................................................................ 43

26 U.S.C. § 5000A ........................................................................................................... 2

26 U.S.C. § 5000A(a) . ................................................................................................... 28

26 U.S.C. § 5000A(b). .................................................................................................... 12

26 U.S.C. § 5000A(b)(1)........................................................................................... 28, 41

26 U.S.C. § 5000A(c). ........................................................................................... 9

26 U.S.C. § 5000A(c)(1). ...................................................................................... 41

26 U.S.C. § 5000A(c)(2). ................................................................................... 9, 41

26 U.S.C. § 5000A(e). ........................................................................................... 9

26 U.S.C. § 5000A(e)(1). ...................................................................................... 41

26 U.S.C. § 5000A(e)(2). ................................................................................. 29, 41

26 U.S.C. § 5000A(f)(1). ....................................................................................... 43

26 U.S.C. § 5000A(g)(1). ...................................................................................... 12

26 U.S.C. § 5000A(g)(2). ...................................................................................... 29

26 U.S.C. § 6671(a). ............................................................................................ 12

26 U.S.C. § 7421(a). ......................................................................................... 2, 12

26 U.S.C. §§ 8001-8023. ...................................................................................... 30

26 U.S.C. §§ 9801-9803. ...................................................................................... 19

28 U.S.C. § 1491(a)(1). ........................................................................................ 31

28 U.S.C. § 2201(a). ............................................................................................ 12

29 U.S.C. § 1181(a). ............................................................................................ 19

29 U.S.C. § 1182. ................................................................................................ 30

42 U.S.C. §§ 300gg, 300gg-1 ................................................................................ 19

42 U.S.C. § 1395dd. ............................................................................................ 24

Pub L. No. 93-406, 88 Stat. 829 (1974). ................................................................ 19

Pub. L. No. 99-272, 100 Stat. 82 (1985). ............................................................... 19

Pub. L. No. 104-191, 110 Stat. 1936 (1996). .......................................................... 19

Pub. L. No. 104-204, 110 Stat. 2935 (1996). .......................................................... 19

Pub. L. No. 105-277,  112 Stat. 2681 (1998). ................................................................. 19

Pub. L. No. 110-343, 122 Stat. 3765 (2008). ................................................................. 19

Pub. L. No. 111-148, 124 Stat. 119 (2010):

§ 1001 ............................................................................................................... 6
§ 1201 ............................................................................................................ 6, 21
§ 1311 ............................................................................................................... 5
§ 1401 ............................................................................................................... 6
§ 1401(a). ........................................................................................................ 43
§ 1402 ............................................................................................................... 6
§ 1421 ............................................................................................................... 6
§ 1501 ............................................................................................................ 2, 6
§ 1501(a). ........................................................................................................ 30
§ 1501(a)(2)(A). ................................................................. 3, 5, 20, 21, 26, 35
§ 1501(a)(2)(B). ........................................................................................... 4, 19
§ 1501(a)(2)(E). ................................................................................................ 5
§ 1501(a)(2)(F). ....................................................................................... 3, 5, 6, 25
§ 1501(a)(2)(G). ............................................................................................. 3, 5
§ 1501(a)(2)(H). ............................................................................................... 6
§ 1501(a)(2)(I). ...................................................................................... 3, 7, 21, 35
§ 1501(a)(2)(J). ....................................................................................... 3, 7, 35
§ 1501(b). .............................................................................................. 1, 8, 27
§ 1513 ............................................................................................................ 6, 43
§ 1513(a). ........................................................................................................ 43
§ 2001 ............................................................................................................... 6
§ 10101(a). ......................................................................................................... 6
§ 10106 .............................................................................................................. 2
§ 10106(a). ........................................................................................................ 35

Pub. L. No. 111-152, 124 Stat. 1029 (2010). ................................................................. 2

## Legislative Authorities

155 Cong. Rec. H6608 (June 11, 2009). ...................................................................... 26

155 Cong. Rec. H8002-8003 (July 10, 2009). .............................................................. 26

*Health Reform in the 21st Century: Insurance Market Reforms:*
   *Hearing Before the  H. Comm. on Ways and Means*, 111th Cong. (2009). .................... 22, 26

H.R. Rep. No. 111-443, pt. II (2010). ..................................................................... 6, 25, 26

Joint Comm. on Taxation, 111th Cong., *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, in Combination with the "Patient Protection and Affordable Care Act"* 31 (Mar. 21, 2010). ............................... 30

S. Rep. No. 111-89 (2009). ........................................................................................... 26

*The Economic Case for Health Reform: Hearing before the H. Comm. on the Budget*, 111th Cong. (2009). ........................................................................................... 25, 26

*State Coverage Initiatives: Hearing Before the Subcomm. on Health of the H. Comm. on Ways and Means*, 110th Cong. (2008). ........................................................................................... 20

## Miscellaneous

Bruce Ackerman, *Taxation and the Constitution,* 99 Colum. L. Rev. 1 (Jan. 1999). ................... 40

Cong. Budget Office, *An Analysis of Health Insurance Premiums Under the Patient Protection and Affordable Care Act* (Nov. 30, 2009) ................................................................... 7

Cong. Budget Office, *Key Issues in Analyzing Major Health Insurance Proposals* (Dec. 2008) . ............................................................................... *passim*

Cong. Budget Office, *The Long-Term Budget Outlook* (June 2009) . ........................................... 5

Council of Economic Advisers, *The Economic Case for Health Care Reform* (June 2009). 25, 26

Council of Economic Advisers, *Economic Report of the President* (Feb. 2010). ....................... 26

Letter from Douglas W. Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker, U.S. House of Representatives (Mar. 20, 2010). ........................................... 5, 7, 31

## INTRODUCTION

Throughout the history of the Republic, the Supreme Court has repeatedly highlighted the "concern about the proper – and properly limited – role of the courts in a democratic society." *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1148 (2009) (internal quotation omitted). The Court has recognized that "courts have no charter to review and revise legislative and executive action" except when doing so is essential to resolve an actual case or controversy predicated on unconstitutional government conduct. *Id.*; *see Massachusetts v. Mellon*, 262 U.S. 447, 489 (1923) (to decide the constitutionality of a statute absent a judicial controversy would "assume a position of authority over the governmental acts of another and coequal department, an authority which [the Court] plainly do[es] not possess").Courts have consistently implemented this bedrock principle by permitting only plaintiffs who suffer actual or imminent injury to bring a constitutional challenge to a statute. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 101-02 (1998) ("For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires."). Plaintiffs do not come close to meeting this standard for standing and ripeness. They challenge a provision of the recently enacted federal health care reform legislation before the provision has ever been enforced – indeed, nearly four years before it even takes effect. They demonstrate no injury now. And they merely speculate whether the law will harm them once it is in force.

The provision at issue directs individuals who are not otherwise exempt, beginning in 2014, either to maintain a minimum level of health insurance coverage or to pay a penalty with their tax return for that year. Patient Protection and Affordable Care Act ("ACA" or the "Act"), Pub. L. No.

111-148, § 1501(b), 124 Stat. 119, 244 (2010) (to be codified at 26 U.S.C. § 5000A).[1] The only conceivable injury that plaintiffs might sustain from the provision cannot occur until 2015, at the earliest, when plaintiffs' tax returns for 2014 – and any potential penalty – would be due. Yet the possibility that any particular plaintiff will incur this penalty is not only distant in time, but also contingent on future circumstances that can change – including each plaintiff's health, financial, and employment status. Plaintiffs thus do not have standing to sue, and their claim is unripe. Moreover, even if plaintiffs do ultimately incur a penalty under the minimum coverage provision, the Anti-Injunction Act, 26 U.S.C. § 7421(a), requires that they bring their challenge in an action for a refund after they have paid the amount owed.

If plaintiffs could surmount these jurisdictional barriers – and they cannot – their claims still would fail on the merits. Through the ACA, Congress addressed a crisis in the interstate healthcare market that comprises more than one-sixth of the American economy. It did so primarily through targeted market reforms and tax incentives. The minimum coverage provision is an essential component of Congress's narrowly-targeted reforms and is well within Congress's authority under the Commerce Clause.

In enacting this regulatory scheme, Congress rightly understood, and plaintiffs do not deny, that virtually everyone at some point needs medical services, which cost money. The ACA regulates economic decisions about how to pay for those services – whether to pay in advance through

---

[1] ACA § 1501 was amended by ACA § 10106. The ACA was also amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) ("HCERA" or the "Reconciliation Act"). Unless otherwise expressly stated, all citations to ACA § 1501 are to that section as amended by § 10106, and all citations to the ACA are to that Act as amended by HCERA. For the Court's convenience, the consolidated statutory text of § 1501, with applicable amendments indicated, is attached as Exhibit A.

insurance or attempt to do so later out of pocket – decisions that, "in the aggregate," substantially affect the $2.5 trillion interstate health care market. *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). Among other things, Congress found that these economic decisions shift costs to the other participants in the health care market, including the federal government, state and local governments, health care providers, insurers, and the insured population, in an amount that reached $43 billion in 2008 alone. ACA § 1501(a)(2)(F). Congress also found that these decisions "increas[e] financial risks to households and medical providers," *id.* § 1501(a)(2)(A); raise insurance premiums, *id.* § 1501(a)(2)(F), precipitate personal bankruptcies, *id.* § 1501(a)(2)(G); and impose higher administrative expenses, *id.* § 1501(a)(2)(J). Congress determined that, without the minimum coverage provision, the reforms in the Act, such as the ban on denying coverage or raising premiums based on pre-existing medical conditions, would not work, as they would amplify existing incentives for individuals to "wait to purchase health insurance until they needed care," shifting even greater costs onto third parties. *Id.* § 1501(a)(2)(I). Congress thus found that the minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." *Id.* Congress also concluded that requiring the financially able to purchase insurance would spread risks across a larger pool and lower premiums. *Id.* § 1501(a)(2)(I). Congress's authority under the Commerce Clause and Necessary and Proper Clause to adopt the provision is thus clear.

        In addition, Congress has independent authority to enact this statute as an exercise of its power under the General Welfare Clause of Article I, Section 8. *License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867). The minimum coverage provision – in particular, the requirement in the

Internal Revenue Code that individuals who are not otherwise exempt pay a penalty if they do not have the requisite coverage – will raise substantial revenue. The Supreme Court has long held that an assessment of a tax or penalty under the General Welfare power is valid even if the assessment has a regulatory function, even if the revenue purpose is subsidiary, and even if the moneys raised are only "negligible." *United States v. Sanchez*, 340 U.S. 42, 44 (1950). It is equally clear that a penalty predicated on an event – such as a decision not to purchase health insurance – is not a "direct tax" subject to apportionment under Article I, Sections 2 and 9. *United States v. Mfrs. Nat'l Bank of Detroit*, 363 U.S. 194, 197-98 (1960); *Tyler v. United States*, 281 U.S. 497, 502 (1930).

Plaintiffs' other claims fare no better. The law is unequivocal that requiring individuals to spend money – in an amount that is presently unknown – either to maintain insurance or to pay a penalty is not a taking, and thus does not implicate the constitutional requirement that the government pay "just compensation." Similarly, under precedents that have controlled since the 1930s, when the Court abandoned *Lochner* and its progeny, the minimum coverage provision fully comports with substantive due process. Insofar as the provision affects economic relationships, it satisfies rational basis review. Further, although plaintiffs assert that the provision compels them to disclose private medical information to insurance companies, they point to no such disclosure requirement in the language of the statute, or to any provision that weakens the stringent laws protecting medical privacy. Rather, plaintiffs proffer overbroad and premature assumptions regarding the information insurers might decide to collect come 2014.  Finally, Lieutenant Governor Bryant lacks standing to raise separate claims on behalf of the State of Mississippi and state employees, and his claims, in truth, merely repeat the same challenge to the minimum coverage provision raised by the other plaintiffs. Accordingly, this case should be dismissed.

-4-

## STATUTORY BACKGROUND

In 2009, the United States spent an estimated 17 percent of its gross domestic product on health care. ACA § 1501(a)(2)(B). Nevertheless, 45 million people went without health insurance in 2009, and, absent the new legislation, that number would have climbed to 54 million by 2019. Cong. Budget Office ("CBO"), *Key Issues in Analyzing Major Health Insurance Proposals* 11 (Dec. 2008); *see also* CBO, *The Long-Term Budget Outlook* 21-22 (June 2009); Letter from Douglas W. Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker, U.S. House of Representatives tbl. 4 at 21 (Mar. 20, 2010) [hereinafter CBO Letter].

The record before Congress documents the staggering costs that a broken health care system visits on individual Americans and on the Nation. The millions who have no health insurance still receive some degree of medical assistance, but often cannot pay for it. The costs of that uncompensated care are shifted to governments, taxpayers, insurers, and the insured. ACA § 1501(a)(2)(F). In addition, the lack of insurance costs the economy more than $200 billion a year "because of the poorer health and shorter lifespan of the uninsured," *id.* § 1501(a)(2)(E), and causes, at least in part, most personal bankruptcies, *id.* § 1501(a)(2)(G). All these costs, Congress determined, have a substantial effect on interstate commerce. *Id.* § 1501(a)(2)(F).

To counter this critical threat to the American economy, the Act comprehensively "regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health care is paid for, and when health insurance is purchased." ACA § 1501(a)(2)(A). First, to address inflated fees and premiums in the individual and small-business insurance market, the Act permits States (or, if they decline, the federal government) to establish health insurance exchanges "as an organized and transparent marketplace for the purchase of health insurance where individuals

-5-

and employees . . . can shop and compare health insurance options." H.R. Rep. No. 111-443, pt. II, at 976 (2010) (internal quotation omitted). The exchanges coordinate participation and enrollment in health plans and provide consumers with needed information. ACA § 1311. Second, the Act builds on the existing system of employer-sponsored health insurance, in which many individuals receive coverage as part of their employee compensation. *See* CBO, *Key Issues*, at 4-5. It creates tax incentives for small businesses to provide health insurance to their employees, and prescribes potential assessments on large businesses that do not provide adequate coverage leading their employees to receive tax credits in a health insurance exchange. ACA §§ 1421, 1513.

Third, the Act subsidizes insurance coverage for much of the uninsured population. Nearly two-thirds of the uninsured are in families with income less than 200 percent of the federal poverty level, H.R. Rep. No. 111-443, pt. II, at 978 (2010), compared to 4 percent in families with income over 400 percent of the poverty level. CBO, *Key Issues*, at 11. The Act reduces this gap by providing tax credits and reduced cost-sharing to those with income between 133 and 400 percent of the federal poverty line, ACA §§ 1401-1402, and by expanding Medicaid eligibility to individuals with income below 133 percent of the poverty level. *Id.* § 2001.

Fourth, the Act removes barriers to insurance coverage, prohibiting common industry practices that increase premiums – or deny coverage entirely – for those most in need of health care. Most significantly, the Act bars insurers from refusing to cover individuals with pre-existing medical conditions. ACA § 1201. It also bars insurers from rescinding coverage, other than for fraud or misrepresentation, and from declining to renew coverage based on health status. *Id.* §§ 1001, 1201. And it prohibits caps on a policyholder's annual or lifetime coverage. *Id.* §§ 1001, 10101(a).

Finally, the Act requires that all Americans, with specified exceptions, maintain a minimum

level of health insurance coverage, or pay a penalty. ACA § 1501. Congress found that this provision "is an essential part of th[e] [Act's] larger regulation of economic activity," and that its absence "would undercut Federal regulation of the health insurance market." *Id.* §1501(a)(2)(H). That judgment rested on a number of Congressional findings. Congress found that, by "significantly reducing the number of the uninsured, the requirement, together with the other provisions of this Act, will lower health insurance premiums." *Id.* § 1501(a)(2)(F). Conversely, and importantly, Congress found that, without the minimum coverage provision, the Act's other reforms, such as the ban on denying coverage based on pre-existing conditions, would amplify existing incentives for individuals to "wait to purchase health insurance until they needed care," thereby further shifting costs onto third parties. *Id.* § 1501(a)(2)(I). Congress concluded that the minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." *Id.*

The CBO projects that over 10 years, the Act will reduce the ranks of the uninsured by approximately 32 million, CBO Letter at 9, 15, and that its combined reforms and tax credits will reduce average insurance premiums in the individual and small-group markets. *Id.* at 15; CBO, *An Analysis of Health Insurance Premiums Under the Patient Protection and Affordable Care Act* 23-25 (Nov. 30, 2009). And the CBO estimates that the interrelated revenue and spending provisions in the Act – including revenue from the minimum coverage provision – will net the federal government more than $100 billion in the next decade. CBO Letter at 2.

## ARGUMENT

**I.     Plaintiffs' Claims Should Be Dismissed for Lack of Subject Matter Jurisdiction**

**A.     Plaintiffs Lack Standing Because They Have Alleged No Cognizable Injury Fairly Traceable to the Minimum Coverage Provision**

Plaintiffs' amended complaint ("Complaint") presents a facial challenge directed exclusively to the minimum coverage provision. To establish standing to challenge this provision, plaintiffs must show that they have "suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation omitted). In addition, plaintiffs must show "a causal connection between the injury and the conduct complained of," and that the injury is redressable by a favorable decision. *Id.* at 560-61.

Here, the "conduct complained of" is the enactment of the minimum coverage provision. It is well established that, where a plaintiff raises a constitutional challenge to a statute, he "must be able to show . . . that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement." *Poe v. Ullman*, 367 U.S. 497, 504-05 (1961) (internal quotation omitted). As plaintiffs point out, the minimum coverage provision is enforced through a penalty assessed on individuals if, beginning in 2014, they are not exempt and fail to maintain a minimum level of health insurance. Compl. ¶¶ 27, 56. As of now, no plaintiff has incurred this penalty, and no one could until, at the earliest, 2015, when 2014 tax returns will be due. ACA § 1501(b).

While not disputing that fact, plaintiffs assert that they currently "do not possess any form of health insurance," and "have no intention to obey" the minimum coverage provision. Compl. ¶ 26. Therefore, they claim, there is a "credible threat" that they will incur the penalty. *Id.* ¶ 27.

Labeling a threat "credible," however, does not supply the immediacy required. A potential injury four years in the future is "too remote temporally" to support standing. *See McConnell v. FEC*, 540 U.S. 93, 226 (2003) (Senator lacked standing to challenge campaign ad regulations when next campaign was in five years); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (injury "must be concrete in both a qualitative and temporal sense"); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) (plaintiff must be *"immediately in danger of sustaining"* an injury).

Moreover, when a plaintiff relies on a threat of future enforcement to justify standing, that threat must be "certainly impending." *Babbitt v. United Farmer Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (internal quotation omitted). Where the threat is "imaginary or speculative," it cannot support standing. *Id.* (internal quotation omitted). Plaintiffs' current stated intention, and their assertion that defendants are "seriously intent on enforcing" the minimum coverage provision, Compl. ¶ 25, make it no less speculative that plaintiffs will ever incur the § 5000A penalty. To an extent that cannot be predicted with any reliability, plaintiffs' personal situations could change within the next four years. They may satisfy the minimum coverage provision by finding employment in which they receive health insurance as a benefit. They may also satisfy the provision by qualifying for Medicare or Medicaid. They may contract a serious illness requiring expensive medical treatments, become unable to pay for their care without insurance, and then decide to purchase a policy. They may qualify for one of the Act's several exemptions if they "cannot afford coverage," or would suffer financial hardship. 26 U.S.C. § 5000A(e). Upon reviewing the yet-to-be-created menu of insurance options in the new exchanges, they may find one they wish to purchase and may choose to comply with the minimum coverage provision. Under any of those eventualities, and countless others, plaintiffs would end up complying with the provision and thus would not incur

-9-

any penalty. The speculative prospect of a penalty cannot support standing or ameliorate the prospect that any decision now by the Court on the merits could turn out to be advisory.

Plaintiffs alternatively try to establish imminent injury by asserting a current need to "plan for, invest, save and exhaust . . . personal resources," in preparation for their anticipated need to either purchase health insurance in 2014 or pay the penalty – which in the first year could be as low as $95 for a single individual, *id.* § 5000A(c). Compl. ¶ 27. This effort, too, must fail. For one thing, planning and saving in anticipation of future expected expenses are not "direct economic harm[s]."[2] Until plaintiffs actually purchase health insurance or incur a penalty for failing to do so, they cannot claim to have suffered a financial loss. *See Miller v. Nissan Motor Acceptance Corp.*, 362 F.3d 209, 221-23 (3d Cir. 2004) (no cognizable injury where plaintiffs "never paid [an] early termination charge" and therefore "were not harmed by it").

Moreover, plaintiffs cannot simply manufacture their own injury – particularly one that is entirely separate from the enforcement mechanism of the challenged provision – by asserting a need to save. Even if plaintiffs were to assert that they had not bought a particular item in order to save money, their own description of their reasons for *not* acting would be "uncorroborated oral evidence" that cannot support standing. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 746 (1975) (disapproving claim that a misleading stock prospectus caused plaintiffs not to purchase stock); *Sanner v. Bd. of Trade*, 62 F.3d 918, 924 (7th Cir. 1995) (individuals lacked standing to claim that a Board of Trade resolution caused them not to sell their soybeans).

---

[2]Plaintiffs' reliance on *Okpalobi v. Foster*, 190 F.3d 337 (5th Cir. 1999), is misplaced. The court there found the plaintiffs had standing because the challenged state law was "immediately and coercively self-enforcing" due to high civil penalties about to take effect. *Id.* at 349. Here, in contrast, the § 5000A penalty will not take effect until 2014 and it is entirely speculative whether these plaintiffs will incur it.

Along similar lines, any decision by plaintiffs to forgo a purchase in the present in anticipation of future budgetary needs is not "fairly traceable" to the ACA. *Summers*, 129 S. Ct.. at 1149; *Sanner*, 62 F.3d at 924. Such a decision – to the extent it constitutes an injury at all – "stems not from the operation of [the challenged statute] but from [plaintiffs'] own . . . personal choice." *See McConnell*, 540 U.S. at 228; *see also Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1137-38 (10th Cir. 2006), *cert. denied*, 550 U.S. 904 (2007); *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). The minimum coverage provision does not require plaintiffs to do anything now. And while plaintiffs are entitled to engage in future budgetary planning, a holding that plaintiffs' self-determined calculations in the present could satisfy "causation" would gut the doctrine of standing, enabling all would-be plaintiffs to sue in order to challenge the most remote contingencies on the ground that they have decided to forgo current expenditures in anticipation of potential future expenses. Indeed, plaintiffs do not claim to have calculated a particular amount that they hope to save, nor do they assert facts suggesting that their previous saving patterns would not suffice to pay any incurred penalty. And if plaintiffs were to purchase insurance rather than incur the penalty, their potential insurance expenses in 2014 may be lower than they predict – and also lower than their potential out-of-pocket health care expenses – for any number of reasons, including changes in their employment, unforeseen financial or medical circumstances, or eligibility for Medicare or Medicaid. In sum, plaintiffs satisfy neither the injury nor the causation requirement under Article III, and this Court thus lacks jurisdiction.

**B.     Plaintiffs Cannot Evade the Procedures Prescribed in the Anti-Injunction Act for an Individual to Contest a Liability under the Minimum Coverage Provision**

This Court lacks jurisdiction for a second, independent reason. Because, as noted, the only

statutory mechanism for enforcing the minimum coverage provision is the penalty added to an individual's taxes, beginning with the 2014 tax year, plaintiffs in this action necessarily seek to restrain the federal government from enforcing this penalty. *See* Compl. ¶ 110 (seeking injunctive and declaratory relief as to the validity of the penalty set forth in the minimum coverage provision). The Anti-Injunction Act ("AIA") bars plaintiffs from seeking such relief. The AIA provides in relevant part that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). District courts accordingly lack jurisdiction to enjoin the enforcement of any tax or penalty before it is assessed. *See Warren v. United States*, 874 F.2d 280, 282 (5th Cir. 1989); *Linn v. Chivatero*, 714 F.2d 1278, 1282 (5th Cir. 1983); *Bartley v. United States*, 123 F.3d 466, 467-68 (7th Cir. 1997). Rather, to preserve the Government's ability to collect assessments with "a minimum of preenforcement judicial interference," the AIA "require[s] that the legal right to the disputed sums be determined in a suit for refund." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974) (internal quotation omitted).[3] It does not matter that the statute refers to this payment as a "penalty" rather than a "tax." *Cf.* 26 U.S.C. § 5000A(b). The penalty is "assessed and collected in the same manner" as other penalties under the Internal Revenue Code, 26 U.S.C. § 5000A(g)(1), and, like these other penalties, falls within the bar of the AIA. 26 U.S.C. § 6671(a); *Warren*, 874 F.2d at 282 ("The reference in the [AIA] to 'tax' is deemed also to refer to certain penalties . . . ." (citing § 6671(a))). The AIA thus bars plaintiffs' effort to enjoin enforcement of the

---

[3]The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a), similarly withholds district court authority to grant such relief "with respect to Federal taxes." As the Supreme Court noted in *Bob Jones*, 416 U.S. at 732 n.7, the DJA's tax exception demonstrates the "congressional antipathy for premature interference with the assessment or collection of any federal tax."

minimum coverage provision.

**C.    Plaintiffs' Claim Is Not Ripe for Review**

This Court lacks jurisdiction for a third reason as well: Plaintiffs' claim is not ripe for review. "'[T]he ripeness doctrine seeks to separate matters that are premature for review because the injury is speculative and may never occur, from those cases that are appropriate for federal court action.'" *Roark & Hardee LP*, 522 F.3d at 544 n.12 (quoting Erwin Chemerinsky, Federal Jurisdiction § 2.4.1 (5th ed. 2007)). Ripeness is particularly at issue where, as here, plaintiffs ask the Court for a declaratory judgment based on pre-enforcement review of a statute. *See id.* at 544. The "key considerations" in this inquiry are "'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Id.* at 545 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). "[E]ven where an issue presents purely legal questions, the plaintiff must show some hardship in order to establish ripeness." *Id.* (internal quotation omitted).

Plaintiffs satisfy neither prong of the inquiry because, as discussed, they can sustain no possible injury before the minimum coverage provision goes into effect in 2014. Nor can they establish with any reliability that they will remain uninsured at that time, or become subject to a penalty as a result. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (claim not ripe if it rests on "contingent future events that may not occur as anticipated, or indeed may not occur at all" (internal quotation omitted)). As explained, changes in plaintiffs' health, employment, or financial status between now and 2014 could lead them to acquire health insurance or to qualify for a statutory exemption from the minimum coverage requirement. The future impact of the minimum coverage provision on plaintiffs is thus uncertain, and their claim is unripe. *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163-64 (1967).

-13-

Again, plaintiffs' assertion that they are saving money to cover their expected future expenditure on health insurance or a penalty does not ripen their claims. In *Abbot Laboratories*, the Supreme Court found that the plaintiffs had established a "direct effect on the[ir] day-to-day business," sufficient to support ripeness, because the regulated parties "risk[ed] serious criminal and civil penalties" if they failed to make immediate changes in their labeling and promotional activities. 387 U.S. at 152-53. Here, in contrast, no imminent enforcement of the minimum coverage provision compels any changes plaintiffs choose to make in their current budgeting patterns. *See, e.g.*, *Texas v. United States*, 523 U.S. 296, 301 (1998) (distinguishing *Abbott Labs.* because the plaintiff "is not *required* to engage in, or to refrain from, any conduct" to avoid criminal sanction (emphasis added)); *A. O. Smith Corp. v. FTC*, 530 F.2d 515, 524 (3d Cir. 1976) (no "pre-enforcement judicial review of agency action if there is no immediate threat of sanctions for noncompliance, or if the potential sanction is de minimis"); *Bethlehem Steel Corp. v. EPA*,  536 F.2d 156, 163-64 (7th Cir. 1976) (asserted impacts on "long range capital planning" or anticipatory "allocation of funds" were insufficient to justify immediate judicial review).

In sum, because the minimum coverage provision does not require plaintiffs "to engage in, or to refrain from, any conduct" now, *Texas*, 523 U.S. at 301, plaintiffs' claim is unripe.  As the Court has recognized repeatedly, "[d]etermination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Int'l Longshoremen's & Warehousemen's Union v. Boyd*, 347 U.S. 222, 224 (1954); *see United States v. Raines*, 362 U.S. 17, 22 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.").

-14-

II.     **This Action Should Be Dismissed for Failure to State a Claim**

A.     **The Comprehensive Regulatory Measures of the ACA, Including the Minimum Coverage Provision, Are a Proper Exercise of Congress's Powers Under the Commerce Clause and the Necessary and Proper Clause**

Even if plaintiffs could surmount these jurisdictional barriers, their constitutional challenge would fail on the merits. In a facial challenge to a federal statute, such as this one, a plaintiff may prevail only "by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)). Plaintiffs cannot make this showing. Plaintiffs assert, first of all, that the minimum coverage provision exceeds Congress's authority under the Commerce Clause. Their claim is mistaken, for two primary reasons. First, the provision regulates *economic* decisions regarding the way in which health care services are paid for – decisions that, in the aggregate, have a direct and substantial effect on interstate commerce. Second, Congress had far more than a rational basis to find the provision essential to the Act's larger (unchallenged) effort to regulate the interstate business of insurance. The provision prohibits participants in the health care market from economic risk-taking that shifts costs of health care to third parties, and prevents individuals from relying on the Act's insurance reforms (such as the ban on denying coverage or increasing premiums for people with pre-existing conditions) to delay buying health insurance until illness strikes or accident occurs. In short, based on detailed congressional findings, which were the product of extensive hearings and debate, the provision directly addresses cost-shifting in those markets, quintessentially economic activity, and is an essential element of a comprehensive, interrelated regulatory scheme. Moreover, in focusing on services people almost certainly will receive, and regulating the economic decision

-15-

whether to pay for health care in advance through insurance, or to try to pay later out of pocket, the provision – contrary to plaintiffs' claim – does not open the door to regulation of a full range of life choices. For these reasons, the provision falls well within Congress's constitutional authority to regulate interstate commerce and to take measures reasonably adapted to accomplish the ends of the Act.

### 1. Congress's Authority to Regulate Interstate Commerce Is Broad and the Court's Review Is Deferential

The Constitution grants Congress the power to "regulate Commerce . . . among the several States," U.S. Const., art. I, § 8, cl. 3, and to "make all Laws which shall be necessary and proper" to the execution of that power, *id*. cl. 18. This grant of authority is broad. Congress may "regulate the channels of interstate commerce"; it may "regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce"; and it may "regulate activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005). In assessing whether an activity substantially affects interstate commerce, the question is not whether any one person's conduct, considered in isolation, affects interstate commerce, but whether there is a rational basis for concluding that the *class of activities*, "taken in the aggregate," substantially affects interstate commerce. *Id.* at 22; *see also Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942). In other words, there is no de minimis exception; instead, where regulation of a class of activities is "within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.'" *Raich*, 545 U.S. at 17, 23 (internal quotation omitted).

In exercising its Commerce Clause power, Congress may reach even wholly intrastate, noncommercial matters when it concludes that failure to do so would undercut the operation of a

larger regulatory program. *Id.* at 18. The Fifth Circuit has expressly followed this principle, for example, upholding regulation of intrastate takes of Cave Species under the Endangered Species Act on the ground that such regulation was essential to the statute as a whole. *GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 640-41 (5th Cir. 2003). Similarly, the court upheld the reasonable accommodations provision of the Fair Housing Amendments Act as an "integral part" of Congress's program to "counteract the economic effect of housing discrimination at the national level." *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 210 (5th Cir. 2000). The court also upheld the application of the Freedom of Access to Clinic Entrances Act to a local clinic based on Congress's findings that the application was necessary to its larger regulation of the interstate commercial market for abortion services. *United States v. Bird*, 124 F.3d 667, 678 (5th Cir. 1997), *cert. denied*, 523 U.S. 1006 (1998), *reaff'd by* 401 F.3d 633 (5th Cir.), *cert. denied*, 126 S. Ct. 250 (2005).

In assessing these congressional judgments regarding the impact on interstate commerce and the necessity of individual provisions to the overall scheme, the task of the Court "is a modest one." *Raich*, 545 U.S. at 22.[4] The Court need not itself measure the impact on interstate commerce of the activities Congress seeks to regulate, nor need the Court calculate how integral a provision is to a larger regulatory program. The Court's task instead is to determine "whether a 'rational basis' exists" for Congress's conclusions. *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 557 (1995)); *see United States v. Bailey*, 115 F.3d 1222, 1225 (5th Cir. 1997) ("legislation enacted under the Commerce Clause [can be invalidated] only if it is clear that there is no rational basis for a congressional finding that the regulated activity sufficiently involves interstate commerce"). In other

---

[4]The Tenth Amendment,  which plaintiffs repeatedly cite, does not change the analysis. "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992).

-17-

words, this Court may not second-guess the factual record upon which Congress relied.[5]

The Supreme Court's decisions in *Raich* and in *Wickard* illustrate the breadth of the Commerce power and the deference accorded Congress's judgments. In *Raich*, the Court sustained Congress's authority to prohibit the possession of home-grown marijuana intended solely for personal use, deferring to Congress's judgment that no exception to its controlled substance regulation was warranted. *Raich*, 545 U.S. at 26-27. Likewise in *Wickard*, the Court deferred to Congress's judgment that wheat grown for home consumption was subject to regulation, reasoning that such wheat could "suppl[y] a need of the man who grew it which would otherwise be reflected by purchases in the open market," undermining the federal price stabilization scheme. *Wickard*, 317 U.S. at 128. In each case, the Court upheld obligations on individuals who claimed not to participate in interstate commerce because those obligations were components of larger regulatory schemes.

*Raich* followed *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), and thus highlights the central focus and limited scope of those decisions. Unlike *Raich*, and unlike this case, neither *Lopez* nor *Morrison* involved regulation of economic decisions. And neither case addressed a measure integral to a comprehensive regulatory scheme. *Lopez* involved the Gun-Free School Zones Act of 1990, "a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone." *Raich*, 545 U.S. at 23. Possessing a gun in a school zone was not economic activity. Nor was the prohibition against gun possession "'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" *Id.* at 24 (quoting *Lopez*, 514 U.S. at 561).

---

[5]"[L]egislative facts," Fed. R. Evid. 201 advisory comm. note, may be considered on a motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007).

Indeed, the argument that gun possession affects interstate commerce posited an extended chain reaction – guns near schools lead to violent crime; violent crime imposes costs; insurance spreads those costs. *Lopez*, 514 U.S. at 563-64. The Court found this reasoning too attenuated to sustain the law. *Id.* at 564. Likewise, the statute at issue in *Morrison* simply created a civil remedy for victims of gender-motivated violent crimes. *Raich*, 545 U.S. at 25. Unlike the purchase of health care services or insurance, gender-motivated violent crimes do not involve economic decisions, and the statute focused on violence against women, not on any broader regulation of interstate markets.

### 2. The ACA, and the Minimum Coverage Provision, Regulate the Interstate Market in Health Insurance

Regulation of a vast interstate market that comprises an estimated 17% of our gross domestic product is well within the scope of Congress's authority under the Commerce Clause. ACA § 1501(a)(2)(B). Given the interstate nature of the health insurance market, the Supreme Court has long recognized Congress's power to regulate in this area, *see United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533, 553 (1944), and Congress has repeatedly exercised that power, both by providing directly for government-funded health insurance through Medicare and other programs, and by adopting numerous statutes regulating the content of private insurance policies.[6]

---

[6]In 1974, Congress enacted the Employee Retirement and Income Security Act, Pub L. No. 93-406, 88 Stat. 829 ("ERISA"), establishing federal requirements for private employers' health insurance plans. In the 1985 Consolidated Omnibus Budget Reconciliation Act, Pub. L. No. 99-272, 100 Stat. 82 ("COBRA"), Congress granted certain workers who lose their health benefits the right to continue receiving those benefits for a time. In 1996, Congress enacted the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 ("HIPAA"), to improve access to health insurance by, among other things, generally prohibiting group plans from discriminating against participants based on health status, requiring insurers to offer coverage to small businesses, and limiting the pre-existing condition exclusion period for group plans. 26 U.S.C. §§ 9801-9803; 29 U.S.C. §§ 1181(a), 1182; 42 U.S.C. §§ 300gg, 300gg-1; *see also* Mental Health Parity Act of 1996, Pub. L. No. 104-204, 110 Stat. 2944 (regulating limits on mental health benefits); Newborns' and Mothers' Health Protection Act of 1996, Pub. L. No. 104-204, 110 Stat. 2935

This history of federal regulation of health insurance buttressed Congress's conclusion that only it, and not the States, could act effectively to counter the national health care crisis. Given the current scope of federal regulation, for example, through Medicare and ERISA, "[e]xpecting states to address the many vexing health policy issues on their own is unrealistic, and constrains the number of states that can even make such an effort." *State Coverage Initiatives: Hearing Before the Subcomm. on Health of the H. Comm. on Ways and Means*, 110th Cong. 7 (2008) (Alan R. Weil, Executive Director, National Academy of State Health Policy).

In the ACA, Congress accordingly undertook a comprehensive regulation of the interstate health insurance market. As described in detail above, the Act regulates health insurance provided through the workplace by adopting incentives for small employers to offer or expand insurance coverage. The Act regulates health insurance provided through government programs by, among other things, expanding Medicaid eligibility. The Act regulates health insurance sold to individuals or in small group markets by establishing health insurance exchanges that enable individuals and small businesses to pool their purchasing power and obtain affordable insurance. And the Act regulates the overall scope of health insurance coverage by affording cost-sharing subsidies and premium tax credits to a significant portion of the uninsured; by ending industry practices that have made insurance unobtainable or unaffordable for many people; and, in § 1501 of the Act, by requiring most Americans who can afford insurance to obtain a minimum level of coverage or pay

---

(requiring plans offering maternity coverage to cover a 48-hour hospital stay after birth); Women's Health and Cancer Rights Act of 1998, Pub. L. No. 105-277, § 902, 112 Stat. 2681, 2681-436 (requiring certain plans to offer benefits related to mastectomies). More recently, Congress passed the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, Pub. L. No. 110-343, § 512, 122 Stat. 3765, 3881, requiring parity in financial requirements and treatment limitations for mental health, substance use disorder, medical, and surgical benefits.

a penalty if they fail to do so.

### 3.    The Provision Is Integral to the Larger Regulatory Scheme

Section 1501, like the Act as a whole, regulates conduct that is quintessentially economic and falls within the traditional scope of the Commerce Clause. As Congress recognized, "decisions about how and when health care is paid for, and when health insurance is purchased," are "economic and financial" and thus "commercial and economic in nature." ACA § 1501(a)(2)(A); *see Groome*, 234 F.3d at 208-09 (deferring to Congress's conclusion that discrimination has a disruptive effect on commerce, and was thus an economic activity subject to federal regulation).[7] But even if the minimum coverage provision did not itself regulate decisions that are clearly economic in nature, it would fall within Congress's Commerce Clause authority because it is essential to a larger regulation of interstate commerce – the ACA's reforms of the interstate insurance market, which build on Congress's long-established authority to regulate insurance, and which, in Congress's judgment, could not function effectively without the minimum coverage provision. *See id.* at 210. Analyzing the minimum coverage provision under the Necessary and Proper Clause leads to the same conclusion for fundamentally the same reason. *See Raich*, 545 U.S. at 37 (Scalia, J. concurring). The provision is a reasonable means to accomplish Congress's goal of ensuring access to affordable coverage for all Americans.

As discussed, the Act adopts a series of measures to increase the availability and affordability of health insurance, including in particular measures to prohibit insurance practices that have denied coverage or increased premiums for those with the greatest health care needs. Beginning in 2014,

---

[7]Although Congress is not required to set forth particularized findings of an activity's effect on interstate commerce, when, as here, it does so, courts "will consider congressional findings in [their] analysis." *Raich*, 545 U.S. at 21.

the Act will bar insurers from refusing coverage to individuals with pre-existing medical conditions, and from setting eligibility rules based on health status, medical condition, claims experience, or medical history. ACA § 1201. Plaintiffs do not and cannot contend that these provisions, which directly regulate insurance policies sold nationwide, are outside Congress's commerce power.

Congress found that, absent the minimum coverage provision, these new protections would encourage more individuals to forgo insurance, leading to a smaller insurance risk pool and increased cost-shifting and higher premiums. ACA § 1501(a)(2)(I). Market timers, taking advantage of the guarantee of future insurance coverage regardless of pre-existing conditions, would purchase insurance only when their health care needs were substantial. *Id.* § 1501(a)(2)(A). Premiums would increase because fewer healthy people, engaging in individual risk assessments regarding future health care needs and costs, would decide to acquire insurance. In turn, those individuals who initially had insurance but had fewer health care needs would be encouraged to become market timers themselves, dropping their insurance until they needed to use it (i.e., after a significant illness or accident occurs). A "death spiral" of rising premiums and continuing defections by those anticipating less costly health care needs would result, creating pressures that would "inexorably drive [the health insurance] market into extinction." *Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means*, 111th Cong. 13 (2009) (Dr. Uwe Reinhardt, Princeton University).[8] Accordingly, Congress found the provision "essential" to its broader effort to regulate insurance industry practices that have prevented many from obtaining

---

[8]*See also id.* at 101-02; *id.* at 123-24 (National Association of Health Underwriters) (observing, based on experience of "states that already require guaranteed issue of individual policies, but do not require universal coverage," that "[w]ithout near universal participation, a guaranteed-issue requirement . . . would have the perverse effect of encouraging individuals to forgo buying coverage until they are sick or require sudden and significant medical care").

health insurance, and to increase the availability and affordability of health care. ACA § 1501(a)(2)(I), (J).

The minimum coverage provision is also essential in other ways to the Act's comprehensive scheme to ensure that health insurance coverage is available and affordable. In particular, the Act promotes availability and affordability through (a) "health benefit exchanges" that enable individuals and small businesses to obtain competitive prices for health insurance, (b) financial incentives for employers to offer expanded insurance coverage, (c) premium tax credits and cost-sharing subsidies to eligible individuals and families, and (d) extension of Medicaid eligibility to additional low-income individuals. The minimum coverage provision works in tandem with these and other reforms, to reduce the upward pressure on premiums caused by current underwriting practices. CBO, *Key Issues*, at 81. Those practices, including individualized review of an applicant's health status, inflate the administrative fees that comprise 26 to 30 percent of premiums in the individual and small group markets, ACA § 1501(a)(2)(J), and result in substantially higher premiums or outright denial of insurance coverage for an estimated one-fifth of applicants, CBO, *Key Issues*, at 81. "By significantly increasing health insurance coverage and the size of purchasing pools, which will increase economies of scale, the [minimum coverage] requirement, together with the other provisions of this Act, will significantly reduce administrative costs and lower health insurance premiums," and is therefore "essential to creating effective health insurance markets that do not require underwriting and eliminate its associated administrative costs."  ACA § 1501(a)(2)(J).

Congress thus rationally found that failure to regulate the decision to forgo insurance would undermine the "comprehensive regulatory regime," *Raich,* 545 U.S. at 27, framed in the Act. Specifically, Congress had ample basis to conclude that failing to regulate this "class of activity"

would "undercut the regulation of the interstate market" in health insurance. *Raich*, 545 U.S. at 18. The minimum coverage provision thus falls within Congress's commerce power. *See id.*

Because the minimum coverage provision is essential to Congress's overall regulatory reform of the interstate health care and health insurance markets, it is also a valid exercise of Congress's authority under the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18, to accomplish that goal. "[T]he Necessary and Proper Clause grants Congress broad authority to enact federal legislation." *United States v. Comstock*, 130 S. Ct. 1949, 1956 (2010). It has been settled since *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), that this clause affords Congress the power to employ any means "reasonably adapted to the end permitted by the Constitution." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276 (1981) (internal quotation omitted); *see also Raich*, 545 U.S. at 36 (Scalia, J., concurring in the judgment) ("[W]here Congress has the authority to enact a regulation of interstate commerce, it possesses every power needed to make that regulation effective." (internal quotation omitted)). And when Congress legislates in furtherance of a legitimate end, its choice of means is accorded broad deference. *See Sabri v. United States*, 541 U.S. 600, 605 (2004). As Congress found, the minimum coverage provision is not only "reasonably adapted," but, indeed,  essential to key reforms of the interstate health insurance market. It is thus easily justified under the Necessary and Proper Clause.

### 4.    The Regulated Conduct Substantially Affects Interstate Commerce

The minimum coverage provision is a valid exercise of Congress's powers for a second reason: Decisions about whether to obtain health insurance or to attempt (often unsuccessfully) to pay for health care out of pocket, in the aggregate, substantially affect the interstate health care market. *Cf. United States v. Ogba,* 526 F.3d 214, 239 (5th Cir. 2008) (upholding Medicare fraud

-24-

indictment  because Medicare, Medicaid, and the provision of medical services in general, as well as the fraud at issue when considered in the aggregate, substantially affects interstate commerce). Individuals who forgo health insurance do not thereby forgo health care. This country guarantees emergency health care, regardless of insurance coverage or the ability to pay, under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd.  CBO, *Key Issues*, at 13.  In addition, most hospitals are nonprofit entities with an "obligation to provide care for free or for a minimal charge to members of their community who could not afford it otherwise." CBO, *Key Issues*, at 13. For-profit hospitals "also provide such charity or reduced-price care."  *Id*. Thus, many of those who remain uninsured based on individual risk assessments of their future health care needs and costs "receive treatments from traditional providers for which they either do not pay or pay very little, which is known as 'uncompensated care.'" CBO, *Key Issues*, at 13; *see also* Council of Economic Advisers ("CEA"), *The Economic Case for Health Care Reform* 8 (June 2009) (in *The Economic Case for Health Reform: Hearing before the H. Comm. on the Budget*, 111th Cong. 5 (2009)).

"Uncompensated care," of course, is not free. In the aggregate, uncompensated care amounted to $43 billion in 2008, or about 5 percent of total hospital revenues. CBO, *Key Issues*, at 114. Public funds subsidize these costs.  Through programs such as Disproportionate Share Hospital payments, the federal government paid tens of billions of dollars in uncompensated care for the uninsured in 2008 alone. H.R. Rep. No. 111-443, pt. II, at 983 (2010); *see also* CEA, *The Economic Case*, at 8. The remaining costs fall in the first instance on health care providers, which in turn "pass on the cost to private insurers, which pass on the cost to families." ACA § 1501(a)(2)(F). This cost-shifting creates a "hidden tax" reflected in health care providers' fees and insurers' premiums. CEA, *Economic Report of the President* 187 (Feb. 2010); *see also* H.R. Rep. No. 111-443, pt. II, at 985

-25-

(2010); S. Rep. No. 111-89, at 2 (2009); 155 Cong. Rec. H8002-8003 (July 10, 2009) (Rep. Broun, citing cost-shifting by the uninsured); 155 Cong. Rec. H6608 (June 11, 2009) (Rep. Murphy, same). And as premiums increase, more people decide not to buy coverage, further narrowing the risk pool, which, in turn, further raises premiums for the insured. The result is a self-reinforcing "premium spiral." *Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means*, 111th Cong. 118-19 (2009) (American Academy of Actuaries); *see also* H.R. Rep. No. 111-443, pt. II, at 985 (2010).

Moreover, as noted above, if decisions on how to pay for health care can rest, without limitation, on individual risk assessments, some participants in the health care market will engage in market timing. They will purchase insurance in later years, but choose in the short term to incur out-of-pocket costs with the safety net of emergency room services that hospitals must provide whether or not the patient can pay. *See* CBO, *Key Issues,* at 12-14 (percentage of uninsured older adults in 2007 was roughly half the percentage of uninsured younger adults); CEA, *The Economic Case*, at 17 ("the uninsured obtain some free medical care through emergency rooms, free clinics, and hospitals, which reduces their incentives to obtain health insurance"). By making the economic calculation to opt out of health insurance during these years, these individuals skew premiums upward for the insured population. Yet, when they need care, many of these uninsured will opt back into the health insurance system maintained in the interim by the insured. In the aggregate, Congress found, the economic risk-taking that is involved when individuals decide to forgo health insurance and to pay for health care later or, if need be, to depend on free care, substantially affects the interstate health care market. Congress may, under the Commerce Clause, address these direct and aggregate effects. *See Raich*, 545 U.S. at 16-17; *Wickard*, 317 U.S. at 127-28.

Plaintiffs cannot brush aside these marketplace realities by claiming that an individual who decides to go without insurance is engaged in "inactivity that is expressly designed to avoid entry into the relevant market," or that allowing Congress to regulate such decisions would remove all boundaries on the Commerce Clause because it would "mandate that an individual person engage in an economic transaction with a private company." Compl. ¶ 70, 72. Those assertions misunderstand both the nature of the regulated activity here and the scope of Congress's power.

Individuals who make the "economic and financial" decision to try to pay for health care services without insurance, ACA § 1501(a)(2)(A), are not passive bystanders divorced from the health care market. Individuals who take that economic gamble, not knowing (as they cannot know) what health care costs they may later incur, have not opted out of health care. Rather, they have chosen a method of payment for services they will receive, no more "inactive" than a decision to pay by credit card rather than by check. Indeed, while an individual choosing to pay by credit card knows in advance the risk involved (payment of interest at predetermined rates), the individual forgoing health insurance cannot predict what the cost of that decision will ultimately be – or who will bear it. Congress specifically focused on those who might take that economic risk unnecessarily, exempting individuals who cannot purchase health insurance for religious reasons, as well as those who cannot afford insurance, or who would suffer hardship if required to purchase it. ACA § 1501(b). Notwithstanding plaintiffs' characterization of those volitional economic decisions as an attempt to "avoid entry" into commercial activity, they have a direct and substantial effect on the interstate health care market in which the uninsured and insured alike participate. Those decisions thus are subject to federal regulation.

The ACA in fact regulates economic activity far more directly than other provisions the

Supreme Court has upheld. In *Wickard*, for example, the Court upheld a system of production quotas despite the claim that the statute "forc[ed] some farmers into the market to buy what they could provide for themselves." 317 U.S. at 129. The Court reasoned that "[h]ome-grown wheat in this sense competes with wheat in commerce. The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon." 317 U.S. at 128; *see also id.* at 127 (upholding statute that "restrict[ed] the amount which may be produced for market *and the extent as well to which one may forestall resort to the market* by producing to meet his own needs" (emphasis added)); *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 258-59 (1964) (Commerce Clause reaches decisions *not to engage* in transactions with persons with whom plaintiff did not wish to deal); *Daniel v. Paul*, 395 U.S. 298 (1969) (same). And in *Raich*, the Court rejected the plaintiffs' claim that their home-grown marijuana was "entirely separated from the market" and thus not subject to regulation under the Commerce Clause. 545 U.S. at 30. Here, the ACA regulates a class of individuals who almost certainly will participate in the health care market, who have decided to take the risk that they will be able to finance that participation through future out-of-pocket payment, and whose decisions in the aggregate impose substantial costs on other market participants. Given the substantial effects of these economic decisions on interstate commerce, Congress has authority to regulate under the Commerce Clause.

### B. The Minimum Coverage Provision Is a Valid Exercise of Congress's Independent Power Under the General Welfare Clause

Plaintiffs' challenge fails for an additional reason. Independent of the Commerce Clause, Congress is vested with the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States[.]" U.S.

-28-

Const., art. I, § 8, cl. 1. Congress's power under the General Welfare Clause is "extensive," *License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1866), and authorizes regulation for purposes beyond the scope of Congress's other Article I powers, *United States v. Sanchez*, 340 U.S. 42, 44 (1950) ("Nor does a tax statute necessarily fall because it touches on activities which Congress might not otherwise regulate."); *see also Knowlton v. Moore*, 178 U.S. 41, 59-60 (1900) (Congress could tax inheritances, even if regulation of inheritance was not within commerce power). As the Supreme Court held long ago regarding the Social Security Act, decisions of how best to provide for the general welfare are for the representative branches, not the courts. *Helvering v. Davis*, 301 U.S. 619, 640, 645 & n.10 (1937); *see South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

The minimum coverage provision falls within Congress's "extensive" General Welfare authority. *License Tax Cases*, 72 U.S. at 471. The Act requires individuals not otherwise exempt to obtain "minimum essential coverage" or pay a penalty. 26 U.S.C. § 5000A(a), (b)(1). The provision is part of the Internal Revenue Code and does not apply to individuals who are not required to file tax returns for a given year. *Id.* § 5000A(e)(2). If the penalty applies, it must be reported on a taxpayer's return for the taxable year, as an addition to income tax liability. *Id.* § 5000A(b)(2). The penalty is assessed and collected in the same manner as other tax penalties.[9]

Plaintiffs cite the 1922 case, *Child Labor Tax Case (Bailey v. Drexel Furniture Co.)*, 259 U.S. 20, 38 (1922), which struck down a tax because of its predominantly regulatory purpose. Compl. ¶ 74. However, under the controlling jurisprudence of at least the last 60 years, a regulatory purpose does not place a provision beyond Congress's taxing power. *Sanchez*, 340 U.S. at 44 ("[A]

---

[9]The Secretary of the Treasury may not collect the penalty by filing notice of liens or levies, and may not bring a criminal prosecution for a failure to pay the penalty. 26 U.S.C. § 5000A(g)(2). Revenues from the minimum coverage penalty are paid into general funds.

tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed."); *see also United States v. Kahriger*, 345 U.S. 22, 27-28 (1953); *cf. Bob Jones Univ.*, 416 U.S. at 741 n.12 (Court has "abandoned" older "distinctions between regulatory and revenue-raising taxes"). So long as a statute is "productive of some revenue," courts will not second-guess Congress's exercise of its taxing power, and "will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution." *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937).[10]

The minimum coverage provision easily meets this standard. The Joint Committee on Taxation[11] included the provision in its review of the "Revenue Provisions" of the Act and the Reconciliation Act, analyzing it as a "tax," an "excise tax," and a "penalty."[12] *See* Joint Comm. on Taxation, 111th Cong., *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, in Combination with the "Patient Protection and Affordable Care Act"* 31 (Mar. 21, 2010). Moreover, the Joint Committee estimated the revenue to be raised by this provision

---

[10]Congress has long used the taxing power as a regulatory tool, particularly in the health insurance context. HIPAA, for example, limits the ability of group health plans to exclude or terminate applicants with pre-existing conditions, and imposes a tax on any such plan that fails to comply with these requirements. 26 U.S.C. §§ 4980D, 9801-03. In addition, the Internal Revenue Code requires group health plans to offer COBRA continuing coverage to terminated employees, and similarly imposes a tax on any plan that fails to comply with this mandate. 26 U.S.C. § 4980B.

[11]The Joint Committee is "a nonpartisan committee of the United States Congress, originally established under the Revenue Act of 1926" that "is closely involved with every aspect of the tax legislative process." *See* http://www.jct.gov/about-us/overview.html; *cf.* 26 U.S.C. §§ 8001-8023.

[12]Contrary to plaintiffs' suggestion, Compl. ¶ 73, the statutory label of "penalty" is irrelevant. "In passing on the constitutionality of a tax law [the Court is] concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it." *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941) (internal quotation omitted).

and included that amount when assessing the bill's impact on the deficit. The CBO predicted that it will produce about $4 billion in annual revenue. CBO Letter at tbl. 4 at 2. Thus, as Congress recognized, the minimum coverage provision produces revenue alongside its regulatory purpose, which is all that Article I, Section 8, Clause 1 requires. Particularly given Congress's conclusions that the minimum coverage provision will increase insurance coverage, permit the restrictions imposed on insurers to function efficiently, and lower insurance premiums, ACA § 1501(a), Congress acted well within its authority to integrate the provision into the interrelated revenue and spending provisions in the Act, in aid of its overall goal of advancing the general welfare. *Buckley v. Valeo*, 424 U.S. 1, 90 (1976) (Congress's power under the General Welfare Clause "is quite expansive, particularly in view of the enlargement of power by the Necessary and Proper Clause").

### C.    Plaintiffs' Takings Claim Is Premature and Cannot Prevail

Plaintiffs also claim that the minimum coverage provision, by compelling individuals to maintain health insurance or pay a penalty, effects an unconstitutional "taking" of private property in violation of the Fifth Amendment. Even if plaintiffs' takings theory were viable, the claim is premature. Not only is this action unripe, as explained above, but any entitlement to "just compensation" under the Takings Clause can arise only after a taking occurs. *See Dolan v. City of Tigard*, 512 U.S. 374, 408 (1994) ("Since no taking has yet occurred, there has not been any infringement of [plaintiff's] constitutional right to compensation.").

Even if plaintiffs could proceed with their claim, it necessarily fails on the merits. Ordinarily, a taking involves "a direct government appropriation or physical invasion of private property," or a deprivation of "all economically beneficial use." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537-38 (2005). Plaintiffs do not allege, nor could they, that the government has confiscated or occupied

their property. Rather, they assert that the minimum coverage provision, when it goes into effect in 2014, might require them to spend money – in an as-yet unknown amount – to purchase health insurance or pay a penalty. Compl. ¶ 78. But "[r]equiring money to be spent is not a taking of property." *Atlas Corp. v. United States*, 895 F.2d 745, 756 (Fed. Cir. 1990); *accord Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1340 (Fed. Cir. 2001); *see also Swisher Intern., Inc. v. Schafer*, 550 F.3d 1046, 1054 (11th Cir. 2008) ("[T]he takings analysis is not an appropriate analysis for the constitutional evaluation of an obligation imposed by Congress merely to pay money."); *SRM Chemical Ltd., Co. v. Fed. Mediation & Conciliation Serv.*, 355 F. Supp. 2d 373, 377 (D.D.C. 2005) ("It is also clear that a government-imposed obligation to pay money is not susceptible to a takings analysis."). Indeed, five members of the Supreme Court have adopted this view. *E. Enters. v. Apfel*, 524 U.S. 498, 540 (1998) (Kennedy, J., concurring) (concluding that the "obligation to perform an act, the payment of benefits," is not a taking); *id.* at 554 (Breyer, J., dissenting) (explaining that an "ordinary liability to pay money" does not constitute a taking).[13]

Nor is it at all clear what plaintiffs can claim will be taken from them. If plaintiffs do not fall under one of its exemptions, the minimum coverage provision would not require them to pay into a general fund to provide public-funded services to third parties. To the contrary, any health insurance that plaintiffs purchase would cover their own and their dependents' health care. Like the user fee analyzed in *United States v. Sperry Corp.*, 493 U.S. 52, 63 (1989), the minimum coverage provision provides a return for the money an individual spends to comply. Health insurance, for one, is a significant benefit, particularly if the individual or any dependents require health care. Moreover,

---

[13]Courts have undertaken a takings analysis where the government's action targets a "specific, separately identifiable fund of money." *E. Enters.*, 524 U.S. at 555 (Breyer, J., dissenting); *cf. Swisher*, 550 F.3d at 1056. That is not the case here.

even if no health care were required during a particular period, health insurance coverage is itself of value, providing ongoing protection against the risk of incurring significant health care costs. *Cf. id.* at 63-64 (recognizing that a user fee for the Iran-United States Claims Tribunal provided companies with "the opportunity to use" certain facilities, even if they never actually used them).

To the extent that plaintiffs contend that the prospect of a possible penalty, in the event that they fail to maintain health insurance beginning in 2014, is the asserted "taking" at issue, their claim is also without merit. As a matter of law, courts have consistently rejected the notion that "the imposition of taxes and penalties [can] constitute a taking." *McNeil v. United States*, 78 Fed. Cl. 211, 236 (2007) (citing *Branch v. United States*, 69 F.3d 1571, 1576-77 (Fed. Cir. 1995)); *cf. Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 342-43 (1909) (fines imposed as an enforcement mechanism to prevent  ships from violating immigration law did not qualify as a taking); *Montagne v. United States*, 90 Fed. Cl. 41, 50 (2009) (levy for failure to pay income tax was not a taking). Plaintiffs therefore have no cognizable takings claim.

### D.    The Minimum Coverage Provision Does Not Violate Substantive Due Process

Plaintiffs also assert that the minimum coverage provision violates substantive due process because, first, it requires individuals to enter into contracts with private insurers, and, second, that requirement will in turn "legally require them to share private and personal [medical] information" with those insurers. Compl. ¶¶ 82, 83. In order to state a claim that government action improperly infringes on a right protected by substantive due process, "a plaintiff must first both carefully describe that right and establish it as 'deeply rooted in this Nation's history and tradition.'" *Cantu-Delgadillo v. Holder*, 584 F.3d 682, 687 (5th Cir. 2009) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)) (other internal quotation omitted); *see also Chavez v. Martinez,* 538

-33-

U.S. 760, 775-76 (2003) (plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest for the purposes of substantive due process analysis; vague generalities . . . will not suffice"). If the right, as carefully described, is "deeply rooted," *i.e.*, "fundamental," a court must "subject it to more exacting standards of review." *Cantu-Delgadillo*, 584 F.3d at 687 (internal quotation omitted). If not, however, the court "review[s] only for a rational basis." *Id.*

Here, no fundamental rights are implicated. Plaintiffs first assert "the right of a person to be free from purchasing a good or service the individual does not desire to purchase," and "the right to be free from entering a private contract or an involuntary association" with an insurance company. Compl. ¶¶ 79, 82. The Supreme Court has long since repudiated the theory that contract rights are fundamental. *Lincoln Fed. Labor Union v. Nw. Iron & Metal Co.*, 335 U.S. 525, 536 (1949) (Court "has steadily rejected the due process philosophy enunciated in *Adair* [*v. United States*, 208 U.S. 161 (1908)]"); *see also W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 392 (1937) ("[F]reedom of contract is a qualified and not an absolute right."). Under well-established law today, legislative acts "adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and . . . the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976); *accord Travelers Ins. Co. v. Marshall*, 634 F.2d 843, 849 (5th Cir. 1981); *Woods v. Holy Cross Hosp.*, 591 F.2d 1164, 1176 (5th Cir. 1979). Given this "deferential standard," *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 639 (1993), the Supreme Court has not invalidated any economic or social welfare legislation on substantive due process grounds since the 1930s.

The relevant inquiry here, then, "is only whether a rational relationship exists between the

[minimum coverage provision] and a conceivable legitimate objective. If the question is at least debatable, there is no substantive due process violation." *Energy Mgmt Corp. v. City of Shreveport,* 467 F.3d 471, 481 (5th Cir. 2006) (internal quotation omitted). There is "no need for mathematical precision in the fit between justification and means." *Concrete Pipe & Prods.*, 508 U.S. at 639. Indeed, any conceivably legitimate objective – even if not Congress's true purpose – would be sufficient. *Williamson v. Lee Optical*, 348 U.S. 483, 488 (1955) (sustaining statute based on hypothetical objectives the legislature "might" rationally have pursued).

The Act as a whole, and the minimum coverage provision in particular, easily meet this standard. Congress passed the ACA to address the mounting costs imposed on the economy, the government, and the public as a result of the inability of millions of Americans to obtain affordable health insurance. These are undeniably legitimate legislative aims. *Cf. Montagino v. Canale*, 792 F.2d 554, 557 (5th Cir. 1986) (recognizing government's legitimate interest in "the alleviation of the insurance crisis by reducing malpractice claims, thereby reducing medical malpractice insurance rates, resulting in health care being more accessible to patients at reasonable costs"). And, as noted, Congress sensibly found that, without the minimum coverage provision, the Act's insurance market reforms would not work, ACA § 1501(a)(2)(A), while, with it, the reforms would reduce administrative costs and lower premiums, *id.* § 1501(a)(2)(I)-(J). Congress's chosen means to meet its legitimate objectives are neither arbitrary nor irrational.

In plaintiffs' second substantive due process claim, they assert that the minimum coverage provision implicates an individual privacy right in "private and confidential medical details." Compl. ¶ 83. Plaintiffs evidently seek to invoke what the Fifth Circuit has called a "right to confidentiality." *Nat'l Treasury Employees Union ("NTEU") v. U.S. Dep't of Treasury*, 25 F.3d 237, 242 (5th Cir.

-35-

1994). This claim also fails because, for one thing, the action that plaintiffs identify as implicating such a right – disclosure of medical information – is not government action. *See Priester v. Lowndes County*, 354 F.3d 414, 421 (5th Cir. 2004) (recognizing, in the parallel Fourteenth Amendment, that a plaintiff "alleging the deprivation of Due Process . . . must also show that state action caused his injury"). Indeed, plaintiffs assert that any such disclosure would be made by private individuals such as plaintiffs themselves, in direct communication with their insurers. Compl. ¶ 83. In some circumstances private acts may qualify as government action if they are "fairly attributable" to the government because, for example, the government has "exert[ed] coercive power over*"* or significantly encouraged the private entity. *Cornish v. Corr. Serv. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005). That exception does not apply here, however. By its express terms, the minimum coverage provision does not require private insurance companies to collect confidential medical information from individuals, nor does it require individuals to provide such information to insurance companies. To the extent that insurers request medical information when enrolling an individual in an insurance plan or processing a claim, the link between that request and the minimum coverage provision is far too attenuated for the request for information itself to qualify as government action. *See, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982) (no state action where state was not responsible for nursing home decisions under challenge); *Citizens for Health v. Leavitt*, 428 F.3d 167, 182 (3d Cir. 2005) (disclosures of medical information for routine uses by private insurers did not constitute government action).

Moreover, the prospect of disclosure of medical information to a health insurance company, even if it were considered government action, does not implicate a privacy interest of constitutional significance, particularly where the nature of any such disclosure remains unknown. Plaintiffs do not

suggest that they have yet been required to disclose any private medical information. Indeed, their stated intention not to comply with the minimum coverage provision, and instead to incur the § 5000A penalty, suggests that, even if insurers were to require such information before providing coverage, plaintiffs will not be affected. Compl. ¶ 26. At the same time, a number of factors cast doubt on whether, once the minimum coverage provision and other ACA provisions go into effect, insurers are even likely to request medical information during the enrollment process. For one thing, the ACA prohibits insurers from basing coverage determinations on whether an individual has a pre-existing medical condition. For another, the contours of "minimum essential coverage" have not yet been set forth by regulation. Because the menu of insurance options is not yet available, it remains unknown whether plans might be available that specifically address individual privacy concerns. It is premature to predicate a constitutional ruling on the rigid assumption that, should plaintiffs enroll in an insurance plan in 2014, they inevitably will be required to disclose private information. In addition, the minimum coverage provision does not require that anyone actually submit claims to their insurer, so plaintiffs' asserted injury in that respect is entirely speculative as well. *Cf. Wilson v. Collins*, 517 F.3d 421, 430 (6th Cir. 2008) (finding no substantive due process violation based on requirement that plaintiff provide DNA sample where plaintiff's concerns about future misuse "are purely speculative").

A further factor suggesting that the minimum coverage provision does not implicate any interest in confidentiality of a constitutional dimension is that there is no realistic threat of *public* disclosure of whatever information plaintiffs might ultimately submit to their insurers. *Cf. Plante v. Gonzalez*, 575 F.2d 1119, 1133 (5th Cir. 1978). As the Fifth Circuit explained in *Plante*, the only two Supreme Court cases to consider the confidentiality strand of privacy found the lack of such a

threat significant. In *Whalen v. Roe*, 429 U.S. 589 (1977), the Supreme Court held no privacy interest was implicated by a statute requiring the creation of an electronic state database with information about prescription drug recipients because the database did not make the information publicly available. *Id.* at 600-02. Indeed, the Court recognized that "disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice," and there was no impermissible invasion of privacy even though (unlike here) the statute at issue required these entities to provide medical information to the government. *Id.* at 602. Similarly in *Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425 (1977), the Court concluded that the screening of the plaintiff's Presidential papers, including those containing personal communications, by government archivists with an "unblemished record . . . for discretion" did not violate his privacy interests. *Id.* at 464.

Here, as in *Whalen* and *Nixon*, there is no threat of public disclosure. Insurance companies, like other entities that routinely "have access to individually identifiable medical information and who conduct certain electronic health care transactions," are themselves bound by confidentiality requirements, such as those set forth in HIPAA. *See Acara v. Banks*, 470 F.3d 569, 570-71 (5th Cir. 2006). The court need go no further to reject plaintiffs' "right to confidentiality" claim. But even if the court did proceed with a substantive due process inquiry, no confidentiality right in this context, where information is safeguarded against public disclosure, could qualify as "fundamental." *Cf. Summe v. Kenton County Clerk's Office*, 604 F.3d 257, 271 (6th Cir. 2010); *Nunez v. Pachman*, 578 F.3d 228, 287 (3d Cir. 2009). Under  rational basis scrutiny, as discussed,  plaintiffs' claim fails.

Nor can plaintiffs' claim survive the balancing test that the Fifth Circuit has employed. *NTEU*, 25 F.3d at 242. Because, as explained, there is no significant risk that the information at issue

-38-

will be publicly disclosed, or that the information will be used other than for the routine and familiar uses necessary to process individuals' health insurance enrollments and claims, any privacy interests here cannot outweigh the government's undeniably legitimate interest in enacting the minimum coverage provision. *See Fadjo v. Coon*, 633 F.2d 1172, 1176 (5th Cir. 1981) (Supreme Court in *Whalen* rejected a confidentiality claim because "chances of public disclosure were minimal"). Thus, under this analysis as well, the provision must be upheld.

### E.   The Minimum Coverage Provision Does Not Impose an Unconstitutional Unapportioned Capitation or Direct Tax

Count Two of plaintiffs' Complaint asserts that the penalty that an individual may incur pursuant to the minimum coverage provision is a "capitation and a direct tax" that is "not properly apportioned per Article I, section 9, clause 4." Compl. ¶¶ 88-89.[14]  Plaintiffs' argument is doubly incorrect. First, measures enacted in aid of Congress's Commerce Clause powers are not subject to the apportionment requirement that can apply (though it very rarely does) when Congress relies exclusively on its taxing powers. Courts have repeatedly emphasized that the "direct tax" clause provides no basis for setting aside a statutory penalty enacted in aid of Congress's regulation of interstate commerce. After the Supreme Court upheld the Agricultural Adjustment Act's quota provisions under the Commerce Clause in *Wickard*, 317 U.S. 111, various plaintiffs argued that the penalties enforcing the quotas violated the rule of apportionment. *Rodgers v. United States*, 138 F.2d

---

[14]Plaintiffs allege that, through this penalty, the ACA "injures the State of Mississippi's interest as a sovereign" by interfering with its "exclusive authority, except to the extent permitted to the federal government by the Constitution, to make all taxing decisions affecting its citizens." Compl. ¶ 90. However, plaintiffs are individuals and therefore, as discussed below, cannot assert injuries allegedly incurred by a state. As discussed above, plaintiffs lack standing, and their claim is barred, because the penalty is not yet in effect and has not been assessed against them. *Cf. Figueroa v. United States*, 466 F.3d 1023, 1029 (Fed. Cir. 2006) (plaintiff "has standing to challenge the legality of the fees *that he paid*" (emphasis added)).

992, 994 (6th Cir. 1943). The court disagreed because the penalty was "adopted by the Congress for

the express purpose of regulating the production of cotton affecting interstate commerce." *Id.* at 994-

95. The incidental revenue-raising effect did "not divest the regulation of its commerce character,"

and Article I, Section 9 had "no application." *Id.* at 995 (citing *Head Money Cases* (*Edye v.

Robertson*), 112 U.S. 580, 595 (1884)).[15]

Second, even if the taxing power alone justifies the minimum coverage provision, Article I,

Section 9, Clause 4 is still not implicated. The Supreme Court has treated only a very narrow

category of taxes as subject to apportionment under this clause, in light of its derivation from a

compromise at the Constitutional Convention. *See* Bruce Ackerman, *Taxation and the Constitution*,

99 Colum. L. Rev. 1, 8-13 (Jan. 1999). The rule was meant to require those states that took

advantage of their slave population when determining how many representatives they received to pay

a proportionately higher tax as well, while also reducing the relative amount slave states would pay

if the federal government imposed an across-the-board capitation or "head tax." *See id.*

Contrary to plaintiffs' assertions, the minimum coverage provision in no way qualifies as a

"capitation tax," which is a tax imposed "simply, without regard to property, profession, or any other

circumstance." *Hylton v. United States*, 3 U.S. (3 Dall.) 171, 175 (1796) (opinion of Chase, J.);

*accord Pac. Ins. Co. v. Soule*, 74 U.S. 443, 444 (1868). The provision is not a flat tax imposed

without regard to the taxpayer's circumstances. To the contrary, among other exemptions, those with

incomes below the threshold for filing a return, as well as those for whom the cost of coverage would

exceed 8 percent of household income, are excluded from any § 5000A penalty.  26 U.S.C. §

_____

[15]Other circuits agree.  *United States v. Stangland*, 242 F.2d 843, 848 (7th Cir. 1957); *Moon v. Freeman*, 379 F.2d 382, 390-93 (9th Cir. 1967); *see also South Carolina ex rel. Tindal v. Block*, 717 F.2d 874 (4th Cir. 1983); *Goetz v. Glickman*, 149 F.3d 1131 (10th Cir. 1998).

5000A(e)(1), (2). The penalty amount also varies with the taxpayer's household income, subject to a floor of a particular dollar amount, and to a cap equal to the cost of the lowest tier of qualifying coverage for the individual's family size. *Id.* § 5000A(c)(1), (2). And, of course, the penalty does not apply at all if individuals obtain minimum coverage. *Id.* § 5000A(a), (b)(1). The minimum coverage provision thus is tailored to the individual's circumstances and is not a capitation tax.

Nor does it qualify as a "direct tax," which is a tax imposed on property, "solely by reason of its ownership." *Knowlton*, 178 U.S. at 81. The penalty that may be imposed under the minimum coverage provision is not tied to the value of an individual's property, but to an individual's economic decision not to maintain health insurance, made against the backdrop of a regulatory scheme that guarantees emergency care and requires insurance companies to allow people to purchase insurance after they are already sick. The penalty is imposed monthly, 26 U.S.C. § 5000A(c)(2), and each month gives rise to a new taxable event: the individual's decision whether to maintain qualifying health insurance coverage. A tax predicated on a decision, as opposed to ownership, has always been understood to be indirect. *United States v. Mfrs. Nat'l Bank of Detroit*, 363 U.S. 194, 197-98 (1960); *Tyler v. United States*, 281 U.S. 497, 502 (1930). Thus, the penalty is not a direct tax.[16]

### F.   Lieutenant Governor Bryant Lacks Standing To Assert a Tenth Amendment Claim, and No Such Claim Can Prevail

Finally, the assertion in Count Three by Lieutenant Governor Bryant, in his individual

---

[16]Even if the provision would have been viewed as a direct tax prior to the Sixteenth Amendment, given that Congress designed the penalty to vary in proportion to the taxpayer's income, 26 U.S.C. § 5000A(c)(1)(B), (c)(2), it would fall within Congress's authority to "to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration." U.S. Const. amend. XVI.

capacity, of a Tenth Amendment claim, based on the notion that the State of Mississippi and its employees have been commandeered in regard to the health care plans they make available or choose, must be soundly rejected. First of all, to the extent the Tenth Amendment provides a right against commandeering, that right belongs to states, not individuals. Lieutenant Governor Bryant lacks standing to assert a Tenth Amendment claim, having brought this claim "as a private citizen and an employee rather than as an elected official of the State of Mississippi," Compl. ¶ 96. *United States v. Johnson*, 652 F. Supp. 2d 720, 726 (S.D. Miss. 2009) (rejecting defendant's claim that the federal sex offender registration law "requir[ed] State Officials to administer federal law" because "a private citizen, acting on his own behalf and not in an official capacity or on behalf of the state citizenry, lacks standing to raise a Tenth Amendment claim") (citing *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 143-44 (1939)).[17] The Lieutenant Governor's status as a state employee does not change this result. Indeed, employees generally cannot assert claims on behalf of their employers. *Cf. Pagan v. Calderon*, 448 F.3d 16, 28-30 (1st Cir. 2006); *Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1019 (10th Cir. 2006); *J.F. Shea Co., Inc. v. City of Chicago*, 992 F.2d 745, 749 (7th Cir. 1993).

Moreover, while Lieutenant Governor Bryant claims to be "directly injured by the []ACA's mandate that the State of Mississippi offer health insurance plans to its employees that conform

---

[17]The weight of Circuit authority is in accord with this view. *United States* v. *Hacker*, 565 F.3d 522, 524, 525-527 (8th Cir. 2008), *cert. denied*, 130 S. Ct. 302 (2009); *Oregon* v. *Legal Servs. Corp.*, 552 F.3d 965, 972 (9th Cir. 2009); *Brooklyn Legal Servs. Corp.* v. *Legal Servs. Corp.*, 462 F.3d 219, 234-235 (2d Cir. 2006), *cert. denied*, 552 U.S. 810 (2007); *Medeiros* v. *Vincent*, 431 F.3d 25, 28-29, 33-36 (1st Cir. 2005), *cert. denied*, 548 U.S. 904 (2006); *United States* v. *Parker*, 362 F.3d 1279, 1284-85 (10th Cir.), *cert. denied*, 543 U.S. 874 (2004); *see also United States v. Brockway*, 769 F.2d 263, 265 (5th Cir. 1985) (referring to "doubtful assumption" that a private plaintiff could assert a Tenth Amendment claim).

solely to the judgment of the federal government," Compl. ¶ 96, the claim is not logical. For one thing, the Complaint provides no basis to believe that the State of Mississippi fails to offer health insurance coverage that is already fully in compliance with anything that might be required under the ACA, or will fail to do so of its own accord in the future.[18] Even if the Lieutenant Governor could otherwise claim an injury on the State's behalf, he surely cannot do so when no such injury exists. In addition, the ACA does not require that employees accept coverage from an employer. *See* 26 U.S.C. § 4980H (large employers offer "*opportunity* to enroll in minimum essential coverage" (emphasis added)). Rather, employer-sponsored coverage is simply one option that an individual may choose in order to conform to the minimum coverage provision. *Id.* § 5000A(f)(1) ("minimum essential coverage" includes government-sponsored programs, employer-sponsored plans, and plans in the individual market). Thus, the Lieutenant Governor's claimed injury boils down to the same injury asserted by plaintiffs in their Count One challenge to the minimum coverage provision.[19]

---

[18]While the Complaint cites only the minimum coverage provision, the section relevant to the State is actually ACA § 1513, which provides for assessments, beginning in 2014, against large employers that do not offer a minimum level of health insurance coverage if an employee gets a tax credit in an insurance exchange. ACA § 1513(a) (adding 26 U.S.C. § 4980H) [hereinafter 26 U.S.C. § 4980H]. The assessments do not apply to employers that offer "affordable" coverage with "minimum value." *Id.* § 1401(a) (adding 26 U.S.C. § 36B(c)(2)(C)(i), (ii)).To the extent the claim is that the State must offer coverage that includes the Essential Health Benefits package defined in § 1302, that is not the case. 26 U.S.C. § 5000A(f)(1)(B), (2)(A). The Lieutenant Governor as an individual cannot be subject to these assessments, and thus lacks standing to challenge them, for the reasons discussed above. Moreover, any challenge to these assessments is barred by the AIA.

[19]Indeed, Lieutenant Governor Bryant's asserted injury appears even more speculative than that of the other plaintiffs because he appears to be currently insured, and the injury he asserts is merely that the State may be required to provide a greater level of insurance coverage in 2014 than it currently does, and that he – assuming that he remains in his elected office – will then not be able to drop that coverage "in favor of non-insurance without incurring penalties." *See* Compl. ¶ 96. Even if the prospect of such an attenuated chain of events could provide standing, the Lieutenant Governor does not suggest that he might actually wish to drop his insurance.

Lieutenant Governor Bryant's attempt to apply the Tenth Amendment to himself as a state employee likewise makes no sense. He asserts that state employees are "commandeered by the []ACA" because the minimum coverage provision may prevent them from "choos[ing] a healthcare plan that does not" provide minimum essential coverage "either from their employer or on the open market." Compl. ¶¶ 93-94. Of course, this assertion has nothing to do with the principle that Congress may not command a state to enact or enforce a federal regulatory program. *See Reno v. Condon*, 528 U.S. 141, 150 (2000). Congress's imposition of statutory requirements on individuals can in no way be deemed "commandeering," in the sense that the Court has addressed that notion with respect to states. Individuals have no part in enforcing the minimum coverage provision; their only obligation, once the provision takes effect, is to comply with its insurance or penalty requirements, insofar as those requirements apply in a given individual's circumstance. Dressing the claims of Count One in Tenth Amendment garb does not accord the Lieutenant Governor standing.

To the extent the Lieutenant Governor's claim, if he had standing to raise it, could be distinguished from plaintiffs' Count One challenge, he cannot establish a Tenth Amendment violation. The Supreme Court has explained that "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992); *see also Benning v. Georgia*, 391 F.3d 1299, 1308 (11th Cir. 2004) (where an "enactment . . . is within an enumerated power of Congress . . . the Tenth Amendment does not apply"). As discussed above, the minimum coverage provision falls well within Congress's power under the Commerce Clause and the General Welfare Clause. It therefore does not violate the Tenth Amendment. *See United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003) (summarily rejecting Tenth Amendment claim after concluding that a federal statute was

-44-

within Congress's commerce power).[20]

## CONCLUSION

For the foregoing reasons, this case should be dismissed in its entirety.

DATED this 1st day of August, 2010.            Respectfully submitted,

TONY WEST
Assistant Attorney General
IAN HEATH GERSHENGORN
Deputy Assistant Attorney General
DON BURKHALTER
United States Attorney

/s/ Kathryn L. Wyer
JENNIFER R. RIVERA
Director
SHEILA M. LIEBER
Deputy Director
KATHRYN L. WYER
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20001
Tel. (202) 616-8475/ Fax: (202) 616-8470
Email: Kathryn.Wyer@usdoj.gov
*Attorneys for Defendants*

---

[20]To the extent the Lieutenant Governor seeks to challenge ACA § 1513, that provision also falls within Congress's commerce and general welfare powers. The Court "has repeatedly upheld federal regulation of the national labor market as a valid exercise of the commerce power." *United States v. Miss. Dep't of Pub. Safety*, 321 F.3d 495, 500 (5th Cir. 2003). This includes regulation of the terms and conditions of employment, including health insurance benefits, and it includes extending such regulation to state employers on equal terms with private employers. *See, e.g., EEOC v. Wyoming*, 460 U.S. 226 (1983) (Age Discrimination in Employment Act); *Moreau v. Harris County*, 158 F.3d 241, 245 (5th Cir. 1998) (under *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985), Fair Labor Standards Act "could constitutionally apply to states").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was served via ECF on counsel of record for plaintiffs in the above-captioned case.


Dated: August 1, 2010                                        /s/ Kathryn L. Wyer
                                                             Kathryn L. Wyer

-46-